(159 P.3d 1035)
No. 96,390

GWEN WENTLAND, *Appellee*, v. JOHN UHLARIK, *Appellant*.

Opinion filed March 23, 2007.

*Keen A. Umbehr*, of Topeka, for appellant.

*Norbert C. Marek, Jr.*, of Myers, Pottroff & Ball, of Manhattan, for appellee.

Before RULON, C.J., GREENE and McANANY, JJ.

McANANY, J.: John Uhlarik appeals the district court's final order in this protection from stalking (PFS) action, arguing that the order was not based on substantial competent evidence. We find ample evidence to support the district court's order and, therefore, affirm.

Gwen Wentland is a professional track and field athlete who competes in the high jump. Beginning in 1995 she was involved in a romantic relationship with Uhlarik, a professor of psychology at Kansas State University. Wentland and Uhlarik lived together for a time. Their relationship ended in August 2000.

On February 26, 2001, Wentland filed a petition for a protection from abuse (PFA) order, alleging that Uhlarik's conduct placed her in fear of bodily injury. Following a hearing at which Uhlarik failed to appear, the district court issued a final PFA order on March 14, 2001.

Wentland returned to court in 2003 for her first PFS order against Uhlarik. On February 19, 2003, following another hearing which Uhlarik failed to attend, the court issued a final PFS order against him. The order was effective through February 19, 2004.

Wentland sought another PFS order against Uhlarik in 2004. The district court issued its second final PFS order against Uhlarik on May 24, 2004, following a hearing at which his lawyer appeared, though Uhlarik did not. The order was effective through May 24, 2005.

On July 4, 2004, Wentland and Uhlarik executed a "Voluntary Extension of Orders of Protection" by which they agreed to extend the court's May 24, 2004, final PFS order to May 24, 2006. The court later found that while this document was legally insufficient to extend the PFS order, the parties believed that it did so.

On March 3, 2006, Wentland commenced her third PFS action against Uhlarik. This is the action now before us. Wentland predicated this action on encounters in February 2006 with Uhlarik at a Dillons grocery store in Manhattan and again at Logan International Airport in Boston. (Uhlarik had filed a mirror PFS action against Wentland the day before, but the court ultimately denied him any final relief and that action is not a subject of this appeal.) Following the final hearing on Wentland's petition, the court entered its third final PFS order in her favor. Uhlarik appeals.

Uhlarik's challenge is to the sufficiency of the evidence. In this context, our function is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). In considering the sufficiency of the evidence we do not reweigh the evidence or pass on the credibility of the witnesses. To the contrary, we view the evidence in the light most favorable to the prevailing party. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000). In considering the district court's conclusions of law, however, our review is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004).

The Protection from Stalking Act, K.S.A. 60-31a01 *et seq.*, "shall be liberally construed to protect victims of stalking and to facilitate access to judicial protection for stalking victims." K.S.A. 60-31a01(b). A plaintiff requesting a PFS order must prove the allegations of stalking by a preponderance of the evidence. K.S.A. 60-31a05. The district court's ruling, and our analysis, turn upon a reading of K.S.A. 60-31a02, which provides the following definitions:

"(a) 'Stalking' means an intentional harassment of another person that places the other person in reasonable fear for that person's safety.

"(b) 'Harassment' means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose.

"(c) 'Course of conduct' means conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "

At the final hearing on her petition, Wentland described the encounter with Uhlarik at Dillons in February 2006. While Wentland was placing an order at the deli department, Uhlarik walked past her and stood behind a counter while staring at her. Wentland felt uncomfortable so she went down another aisle in the store. When she returned to the deli department to pick up her order, Uhlarik was still standing nearby and was staring at her intently. Ultimately, Wentland left the store without finishing her shopping because she felt scared.

Wentland also testified to the Boston encounter that occurred that same month. She had traveled to Boston to compete in the U.S. Championships in track and field. She thought she saw Uhlarik in the stands but she could not be sure. Following the competition Wentland checked in at the Midwest Airlines ticket counter at Logan International Airport for her return flight. While standing in line she saw Uhlarik standing in the same line, four or five people back. Uhlarik stared at her and made a facial gesture which she described as a type of smile to indicate " 'I'm here.' " Wentland felt surprise and alarm. She testified that her heart raced and she feared for her safety. Wentland believed that Uhlarik's presence in the airport was more than a mere coincidence.

Riley County Detective Darla King testified that Wentland had filed past criminal complaints with the Riley County Police Department (RCPD), reporting violence against her by Uhlarik. Uhlarik was arrested in 2004 and again in March 2006, following a search of his home. During the search, RCPD located nude pictures of Wentland, photographs with Wentland's eyes blacked out, and personal information about Wentland such as her telephone numbers, license plate numbers, and address. Newspaper clippings

as recent as 2004, 4 years after their relationship ended, indicated that Uhlarik had been monitoring Wentland. A search on Uhlarik's home computer revealed that he had Googled Wentland's name over 5,000 times. Officer King opined that the investigation indicated that Uhlarik was obsessed with Wentland.

The district court found that the incidents at Dillons and at the airport "standing alone would not in the Court's opinion place a reasonable person in fear of their safety. However, a reasonable person has to look at the totality of the circumstances and the relationship and the history involved here, which goes back as early as at least the year 2001." After noting the prior PFA and PFS orders entered against Uhlarik, the court concluded "under the totality of the circumstances and the prior history, and then added to the fact that it's uncontroverted the defendant had conducted five thousand searches of the plaintiff's name, I believe would place a person in reasonable apprehension." The court thereupon entered a final PFS order against Uhlarik.

### Prior PFA and PFS Orders

Uhlarik's first argument is that since the district court found the encounters at Dillons and at the airport, standing alone, would not place a reasonable person in fear of his or her safety, Wentland failed to prove a course of conduct consisting of at least two acts over a period of time which evidences a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress.

The district court did not consider these two encounters in isolation, nor will we. We review the trial judge's remarks in the context of all the surrounding facts. These facts include the history of Uhlarik's repeated harassment of Wentland. As we will discuss further below, these facts establish the requisite course of conduct that would cause a reasonable person to suffer substantial emotional distress, as found by the district court. The final PFA order in 2001 was issued upon Wentland proving that Uhlarik engaged in abuse as defined by K.S.A. 60-3102. The final PFS orders issued in 2003 and 2004 followed Wentland's proof that Uhlarik engaged in stalking as defined by K.S.A. 60-31a02. In considering the sig-

nificance of Uhlarik's more recent encounters with Wentland, the district court properly took these prior events into consideration.

Uhlarik argues further that the district court should not have taken judicial notice of these prior court proceedings. We find this curious since it was Uhlarik who first brought these prior actions to the attention of the district court when he attached copies of the orders to, and referred to them in, his motion to dismiss. It was Uhlarik who injected these prior final PFA and PFS orders into the present case. All of these prior orders were issued in cases in the District Court of Riley County, the same court where the instant action was filed and heard. There is but one district court in Riley County though its judges sit in separate divisions. The district court may take judicial notice of its own records. See *State v. Shaffer*, 14 Kan. App. 2d 282, 283-89, 788 P.2d 1341, *rev. denied* 246 Kan. 770 (1990). It was proper for the court to consider its prior orders, copies of which had been filed by Uhlarik in the court file for the present case.

Uhlarik also complains that by taking judicial notice of the previous orders, the trial court denied him due process and equal protection of the law by denying him the opportunity to challenge the evidence against him. We note that, in fact, Wentland testified at the hearing that she had obtained three prior orders against Uhlarik. While Uhlarik certainly could not relitigate these prior actions, he had the opportunity to cross-examine Wentland regarding them and did in fact cross-examine her regarding the May 2004 order. Uhlarik was denied neither due process nor equal protection.

Next, Uhlarik invokes res judicata as a bar to the district court's consideration of the prior PFA and PFS orders. Res judicata bars parties from relitigating their previously litigated claims. *Magstad-tova v. Magstadt*, 31 Kan. App. 2d 1091, 1093, 77 P.3d 1283 (2003). There was no relitigation of the prior claims. Those claims had been reduced to judgment. The fact of the prior judgments was introduced into evidence. This evidence was relevant and properly considered by the district court. Under the PFS act, stalking requires intentional harassment; harassment requires a course of conduct; and a course of conduct requires two or more separate acts. K.S.A.

60-31a02. Wentland alleged and proved two encounters with Uhlarik that had never before been the subject of litigation: the Dillons encounter and the airport encounter. Standing alone they constitute a course of conduct under the statute. The fact of the prior judgments against Uhlarik created a factual context which was relevant to establish the substantial emotional distress that the district court found a reasonable person would experience from these recent encounters.

Uhlarik argues that by relying on these past judgments Wentland was relieved of proving the statutorily required elements of stalking based upon her most recent encounters with Uhlarik at Dillons and at the airport. This argument is without merit. Uhlarik relies upon the court's comment that "[t]hose incidents standing alone would not in the Court's opinion place a reasonable person in fear of their safety." It is clear that the court concluded that had Uhlarik not harassed Wentland in the past, a reasonable person would not have felt fear for personal safety from these isolated events. But it is equally clear that the court determined that Uhlarik's history of harassment would cause a reasonable person, viewing the Dillons and airport events in context, to experience fear for personal safety. The court did not relieve Wentland from the burden of proving her case.

In his final argument relating to the PFA and PFS orders, Uhlarik asserts that the trial court abused its discretion when it considered these prior orders because they were inadmissible under K.S.A. 60-455. First, we note that Uhlarik failed to object when Wentland testified regarding the prior orders. The district court cannot be accused of abusing its discretion when Uhlarik failed to object and thereby give the district court an opportunity to exercise its discretion on the matter. Issues not raised before the trial court cannot be raised on appeal. *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003). Uhlarik has failed to preserve this issue for appeal. K.S.A. 60-404. Further, while K.S.A. 60-455 prohibits the admission of such evidence to prove a disposition to commit other acts of abuse or stalking, such evidence may be admitted to prove some other material fact such as Uhlarik's motive in his encounters with Wentland at Dillons and

at the airport. Thus, the district court's consideration of this evidence did not violate K.S.A. 60-455.

*The Standard of Proof*

Uhlarik argues that the trial court's ruling was predicated upon a "reasonable apprehension" standard which is a lower standard than the "substantial emotional distress" showing required by K.S.A. 60-31a02(c). He bases this argument on the district court's statement:

"[T]he Court believes under the totality of the circumstances and the prior history, and then added to the fact that it's uncontroverted the defendant had conducted five thousand searches of the plaintiff's name, I believe would place a person in *reasonable apprehension*, and as such I'm going to go ahead and grant the order against stalking." (Emphasis added.)

Uhlarik concludes from this that the district court failed to make a finding that Wentland suffered substantial emotional distress.

K.S.A. 60-252 requires the trial court in a court-tried case to make findings regarding the controlling facts and conclusions of law based on those findings. Uhlarik did not object to the trial court regarding its findings and conclusions. Thus, the trial court is presumed on appeal to have found all facts necessary to support its judgment. *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003) (quoting *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 [1998]). Judge Wilson prefaced his ruling with the statutory definition of stalking. Taken in context, it is perfectly clear what Judge Wilson expressed in his ruling. Uhlarik points to Webster's definition of "apprehension" as " '[d]istrust or fear concerning future events; foreboding; misgivings.' " Such an argument begs the question: reasonable apprehension of what? The obvious answer is reasonable apprehension of bodily harm, a concept in complete harmony with the statutory definition of stalking in K.S.A. 60-31a02, which requires a showing of "reasonable fear for that person's safety," and Wentland's testimony of her fear and alarm. The district court applied the correct legal standard in granting relief on Wentland's petition.

*Internet Searches*

With respect to the evidence that Uhlarik conducted over 5,000 internet searches of Wentland's name, Uhlarik argues that his internet searches could not have caused Wentland to fear for her safety or to suffer severe emotional distress because Wentland was not aware of the searches until after she brought this action. Uhlarik did not object to the introduction of this evidence at the hearing. Therefore, the evidence was properly before the court.

Uhlarik cites no authority, and we find none, which limits testimony at trial to the facts as they existed at the time suit commenced. If that were the case, a plaintiff in a personal injury action would be barred from presenting evidence of ongoing injuries and damages suffered since suit was filed. This clearly is not the case.

Under K.S.A. 60-31a02, stalking requires a showing of harassment and harassment requires a showing of a course of conduct. It is the course of conduct, not any particular and isolated act of the defendant, which must cause the requisite harm. Though Wentland was not aware of the internet searches when she commenced this action, she was clearly aware of them at the time of trial. The searches themselves do not constitute stalking. They do, however, constitute evidence of an ongoing course of conduct. Furthermore, they are relevant to show Uhlarik's intent and to negate the likelihood that these encounters were mere coincidences. The district court did not err in considering this testimony.

Next, Uhlarik argues that because Wentland is a public person, she has waived any expectation of privacy with respect to public access to information about her on the internet. This argument is based upon the mistaken notion that the district court found that Uhlarik's 5,000 internet searches on Wentland's name constitute stalking. The district court made no such finding. It is apparent that the district court made note of this testimony since it tended to show Uhlarik's ongoing infatuation with Wentland, his intent, and the probability that the Dillons and airport encounters were not a mere coincidence.

Viewing the evidence in the light most favorable to Wentland, the prevailing party, we conclude that Uhlarik's past harassment of

Wentland, his ongoing infatuation with her, and the recent encounters at Dillons and at the airport provided the district court with ample evidence to support the entry of a final PFS order against Uhlarik.

Affirmed.