NOT DESIGNATED FOR PUBLICATION

No. 116,202

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAY ANDREW VEHIGE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed July 28, 2017. Affirmed in part and reversed in part.

*Ty R. Wheeler* and *Lowell C. Paul*, of Kansas Legal Services, for appellant.

*Darrell L. Smith*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON, J., and FAIRCHILD, S.J.

*Per Curiam*: Jay Andrew Vehige challenges the sufficiency of the evidence for his convictions by a jury of disorderly conduct and stalking. Vehige has failed to designate a record on appeal permitting us to review his challenge to the sufficiency of the evidence supporting the disorderly conduct charge, so we affirm that conviction. But we find the evidence does not support Vehige's conviction of stalking. We reverse that conviction.

1

In July 2014, Jay Vehige, a self-described art student and political activist, opened a Facebook page that he named Emporia Cop Block (ECB). According to Vehige, the purpose of the ECB page was to objectively view the institution of policing as a whole for police accountability and transparency and to stop police brutality. He posted the video recordings he made from following police and his encounters with police on ECB and YouTube.

Vehige was inspired to launch ECB after noticing what he viewed as too many police officers in a community the size of Emporia and hearing stories about police brutality. He testified that he "wanted to just go out there and, from my own point of view, see what was going on, because it seemed like there was [*sic*] so many things being said." He began to follow on-duty officers and observe their behavior after once counting police vehicles pass through the intersection of 4th and Commercial Streets (an area comprised primarily of restaurants and bars) 43 times in a 2-hour period. He also noticed that some of the drivers of those police vehicles did not use turn signals or wear seat belts. He concluded: "[S]o, if they're breaking those simple laws, what other things are they breaking that we don't know about[?]" Vehige testified that he never personally saw any incidents of police brutality.

According to Vehige, supporters and participants of the nationwide movement had to be nonviolent: "You can interrogate or ask questions, but it's not about like trying to create violence or anything straight up. It's more about trying to figure out what's really going on. Very journalistic in its nature." Vehige considered the videos he posted to his ECB and YouTube sites to be an alternative form of media, necessary because the mainstream media did not reliably communicate information regarding police brutality. He testified that when he followed and videotaped police officers, "I always stay in a calm tone and, you know, just go about it in a very respectful manner."

*August 10, 2014, Incident*

On the night of August 10, 2014, three off-duty Emporia police officers—William Kent, Justin Hill, and Daniel Delgadillo—were at a bar at 4th and Commercial, celebrating another officer-friend's successful completion of a bicycle race. They heard a fight break out in the bar, turned and saw one man on the ground, seemingly unconscious, while another man stood over him yelling and apparently ready to continue fighting. That man began to leave the bar. Hill, not knowing how badly the man on the floor was injured, called 911 for medical and police attention. Delgadillo checked on the unconscious man. Kent walked outside, watched the presumed attacker get into a vehicle, and recorded the license tag number on the alleged assailant's car. Hill and Kent then followed the presumed attacker without confronting him. Hill later gave the license plate information to the responding officers and asked them if they needed him to stay. The investigating officers said he could leave, so Hill went to find his friends.

Kent was wearing a t-shirt, jogging shorts, and tennis shoes and did not have his gun, badge, or any other indication that he was a law enforcement officer. Hill was wearing jeans, a t-shirt, and a ball cap. He had no gun or badge but did have his police identification/building access card in his wallet because he never removed it from his wallet. Delgadillo was wearing a t-shirt and shorts, did not have his badge or gun, and wore nothing to suggest he was a law enforcement officer.

Once the three men were reunited outside the bar, they began to walk north on Commercial Street. As the off-duty officers approached 6th Street, Vehige ran up to them, yelling, "Hey, are you guys cops?" Kent and Hill testified that members of the police department were generally aware that Vehige was recording and posting videos of police officers and police activities. Hill testified that he had interacted with Vehige on three or four occasions prior to that evening when being video-recorded by him.

3

Delgadillo testified that he recognized Vehige's voice as he ran up behind the men asking them questions because he also had previously encountered Vehige in the community.

Kent stated that the police department had admonished the officers not to engage with Vehige. He said that he would not talk to Vehige, regardless of the admonishment, out of a fear that Vehige would edit the video of the conversation inaccurately. Hill testified that his police supervisors told him not to say anything to Vehige. Delgadillo stated that the police department supervisors told officers to avoid Vehige, and Delgadillo followed this advice as well as his own "conscious instincts." Hill testified that Vehige had previously edited videos of encounters with Hill and that he thought the edited videos "misrepresent stuff that has been said to him when they are posted on the YouTube and Emporia Cop Block page[s]. So, better not to answer him at all. Give him nothing to edit out." Delgadillo said that none of the three men responded to Vehige. Delgadillo knew from previous videos Vehige posted that Vehige liked to insert things into his videos to misconstrue events in Vehige's favor. If an officer answered even one question, then Vehige would just keep asking more and would not stop.

Vehige walked along with and in front of the three men and held his camera approximately 2 to 2 1/2 feet from them. However, Vehige and his camera got closer to the men as they walked. Hill testified that Vehige got in front of them and, at times, "he had the camera right in our faces and asking us questions." At that point, Vehige broke away from the three men and left them.

When Vehige left, Kent, Hill, and Delgadillo changed directions and went 1 block west to Merchant Street and then continued north on that street. Vehige found the three men again in the 700 block of Merchant Street. Kent testified that when Vehige found them again, he started yelling at them and filming them, "wanting to know about some Jeep . . . that was in the area, wanting to know who [the driver] was." Kent stated that he was confused and did not know what Vehige was talking about. Hill testified that

4

Vehige's questions changed after he found them again and that Vehige was recording them with the camera approximately 15-18 inches from their heads. Delgadillo said when Vehige was closest to them, he could have reached out and touched him and that Vehige was in his personal space. Hill said he tried to keep his eyes forward and not look at Vehige. These two encounters took place while the three officers walked 5 to 6 blocks.

Kent stated that Vehige's second line of questioning challenged the officers' integrity and the way their families raised them. Kent testified that his integrity is key to his role as a law enforcement officer because he must be true and honest and accurate when he performs several of his work functions, such as signing affidavits for search warrants, writing reports, and testifying in court. Kent said that his honesty and integrity are very important character traits for him. He was raised not to steal or lie, to tell the truth, and to respect his elders. He believed that these principles were important when he went through his law enforcement officer training. He testified that when Vehige was following him, he felt harassed, angry, and upset that Vehige was questioning his upbringing. Kent speculated that his training may have made a difference in how he responded to Vehige.

Hill testified that when Vehige did not get a response from them at 6th Avenue, he became more intrusive in his questioning and began trying to demean the men. Hill testified that as Vehige was calling them liars and asking if their mothers raised them to be liars, he became very upset. Hill believed that honesty and integrity were the basis of his job, and when somebody attacks that credibility, that person is attacking the whole existence of his job. Hill testified that Vehige "kept questioning, basically, our integrity and I felt like he was trying to provoke us in some way." Hill testified that Vehige appeared to be trying anything that he could to cause the officers to stop and that it was very hard not to interact with him. Hill stated that people call him names all the time but do not insult his family. Hill admitted that he wanted to beat up Vehige but he knew he could not because he needed a job and has a daughter to support.

Delgadillo testified that his integrity and credibility are his main values and resources as a law enforcement officer. He stated, "I felt I had integrity just as a person and I knew I would become a good police officer from having that." Delgadillo traced his principles to his childhood with his parents. He said he felt angry and upset at Vehige's questions and at the whole encounter. Delgadillo testified that he had concerns about their safety and that he was on a heightened awareness during the encounters.

Kent said that if he is in uniform and is asked for his name and badge number, he provides them, but since he was out of uniform, Vehige should have assumed he was off duty. Kent testified that he has never worked without being dressed in his uniform. Hill testified that he worked out of uniform twice in his 8 years on the force. Hill testified that when he is working, his gun and badge are plainly visible. Hill said that he has never arrested someone while off duty, and he knew of no Emporia officer who had. Hill believed that when he is off duty and not in uniform, he has the same rights as everyone else. Delgadillo testified that he had never worked undercover or in plain clothes. Delgadillo further testified that the Emporia Police Department does not conduct undercover bar checks and that he did not know about other agencies. Although he had never worked in cooperation with another agency on such an undercover assignment, he believed that even those other agencies wear an identifying emblem when they go into the bars.

Kent explained that private citizens call the police if they think a crime has occurred; they provide license plate numbers and offer other assistance to law enforcement. Hill, likewise, testified that it is not uncommon for civilians to provide witness information to him when he is conducting an investigation. Delgadillo testified that none of the three officers filed a report about the bar fight, nor did they provide information to dispatch. They took no statements or witness names, and none of them became actively involved with the investigation into the bar fight.

Vehige testified that he went downtown to the intersection of 4th and Commercial streets at approximately 10 p.m. that evening. He noticed a number of police vehicles in the area and started filming between 10 and 11 p.m., when the bars get packed. Vehige testified that he and some friends were standing on a corner and he saw three officers come out of the bar. Vehige testified that he did not recognize them until he was told by one of his friends that Delgadillo was a police officer; then he recognized them. He said that the three men tipped off the bike cop. Vehige was filming when a higher-ranking officer arrived. Vehige then somehow came to understand that one man was hit in the face with a bottle and another man was knocked out, "so that was what my line of question[s] was related to."

Vehige described the three off-duty officers as wearing gym shorts and PE clothing. Vehige believed they were on duty because they were wearing hats, keeping their heads down, and "circling the area," so he started following and filming them. Vehige testified, "They appear off duty, yet they are communicating and surrounding in a current investigation that I'm filming. So, obviously, you have to take it into the totality of all the circumstances to fully comprehend what's going on." Vehige testified that he followed them for approximately 1 block at that point and then left to go back and retrieve his bicycle.

While away from Kent, Hill, and Delgadillo, Vehige heard from his friends about a man in a Jeep who was apparently in uniform and talking on a walkie-talkie:

> "I was told to—on my telephone, Hey, check out this Jeep, see what's going on with that. See if those guys were related to that. I had no idea where they went. All I knew is they disappeared. So, I started riding my bike down the street and [the Jeep] speeds off like 50 miles an hour or more. So, I'm coming back towards Merchant, just to get back to where my friends are and the officers arrive at that point. . . . [S]o I park my bike and begin to—that's when the second segment begins."

7

Vehige testified that the video he made was accurate, that he did not cut much, but he added editorial comments for "situational understanding." He posted the video on Facebook and YouTube. This video was introduced in evidence at the trial, but the appellant did not designate the video as a portion of the record on appeal.

Vehige testified that his intent that evening was to understand what was happening at the bar, what the three officers' purpose and role was, and how that played into the events that transpired "because there—people were talking about, [the officers] were going there to, I don't know, create altercations, not necessarily physical or anything like that, but just to kind of violate people's privacy in a public forum."

Vehige testified that he would not have followed them if they had told him they were off duty. He testified that he believed they were working in some capacity "[b]ecause of the Jeep and just how it all happened so fast. I was—I was confused." He stated, "I didn't know for a fact whether they were on duty or off duty any more than I knew where they were going, but it appeared they were on duty. So, I—I thought maybe they would open up at some point."

Vehige testified that he never followed officers off duty until August 16, 2014, and that he has not since. He stated that he had never followed a police officer home, nor would he ever. Vehige testified that when he approached and filmed an off-duty jailer getting his mail at his home, he was just driving by, and "I saw a Jeep park and it turned out to be the same vehicle from previous days [August 10, 2014], but just because I stopped there and he stopped there doesn't mean that I knew where his residence was." Vehige testified that a post on Facebook, wherein he claimed that his group could do some investigation of their own and find the Jeep, was about "looking for answers as law enforcement officials do themselves."

8

*August 15-16, 2014, Incident*

Hill testified that Vehige was "active" in his following of law enforcement officers and that Vehige understood the shifts and shift changes of the police officers. Delgadillo also testified that Vehige appeared to know the police shift schedule. Delgadillo regularly worked third ("night") shift, which ended at 6 a.m. Delgadillo had seen Vehige regularly and almost daily while he was on duty. On the night of August 15-16, 2014, Delgadillo was on duty.

While on patrol the night of August 15-16, Delgadillo observed a car following him for approximately 30 blocks. He did not arrest the car's occupants because he acknowledged that they had the right to follow him while he was on duty. He did call for another patrol officer to assist him, and that officer began to follow the car while it was still following Delgadillo. The car stopped following Delgadillo at that point.

In the early morning of August 16, after his shift ended, Delgadillo left the police station at approximately 6:15 a.m. When he got off work, Delgadillo was in uniform, wearing his badge and gun. Delgadillo testified that, as a police officer, he has a fear of being harmed or killed and wears a bulletproof vest as part of his uniform every day as a precaution.

Delgadillo exited the police station and began walking to the parking lot where his personally owned vehicle (POV) was parked. Officers do not take home patrol cars. Delgadillo's POV does not resemble a police vehicle. While walking to his POV, he noticed the car from earlier in the evening parked facing the police department with its engine and lights off. This caused Delgadillo to heighten his awareness because he was easily identifiable in his uniform. Delgadillo stepped into the parking lot and saw the lights and heard the engine of the car come on. He kept walking to his POV and saw the car pull onto the street and begin "going fast in my general direction, so I heightened my

9

awareness even more." Delgadillo got into his POV and put it into reverse to back out of his parking stall; by the time he put his car in drive, the car was directly behind him in the parking lot. Delgadillo could see the silhouettes of two or three individuals in the vehicle. That made him nervous because "it seemed like I was being waited on. Didn't know what their intentions were and there's three of them and one of me."

As he began to drive, Delgadillo noticed the car still behind him, so he began to make a series of turns to confirm that the car was actually following him. Out of concern for his safety, he called the nonemergency number to request that officers on patrol come to his assistance. He felt nervous and anxious. Delgadillo demonstrated on a map for the jury the route he took, including turns and back-tracking, and noted that this is not the most direct route to his home. He remained on the phone with dispatch the entire time, giving them updates on where he was and where he was going. He testified that he was trying to lose the car or get the car to stop following him. He wanted a patrol vehicle to stop the car and keep the car from following him home.

Delgadillo testified that he is married and was getting "somewhat" scared for his wife and their property because, "I don't know what his or their intentions were. If they were trying to get more information on me, see where I live, who I'm with, to maybe—to do harm to them. I just don't know what their intentions were." Delgadillo testified that he even made a left turn through a yellow light, but the car stayed behind him. At that point, Delgadillo decided to drive closer to where the patrol units were, so he turned toward them; at this point, the car disengaged and kept going straight. After another turn, Delgadillo saw the car again at the adjacent corner of an intersection. Delgadillo testified he thought, "He's still trying to look for me; that's all I'm thinking." Still concerned, Delgadillo looked in the car as it turned toward him, and he recognized Vehige in the driver's seat. After this, Delgadillo did not see him again, believing that he lost him. Delgadillo started to drive home, but he remained fearful until he got closer to home and became confident that Vehige was no longer behind him.

Delgadillo acknowledged that Vehige had never been violent in his interactions with police officers but did not know anything about the others in the car with Vehige. He stated that even though he was armed, he did not know if they were armed and he would not be able to keep his eyes on three people.

Delgadillo estimated that after his shift ended that morning Vehige followed him for 8 to 10 blocks. Delgadillo believed that Vehige was listening to a police scanner in the red car and that Vehige had heard that other police cars were coming, causing him to discontinue following Delgadillo.

Vehige testified that he first saw Delgadillo while he was on duty. Vehige was parked at an intersection which community members told him was near a drug house and saw a police vehicle unattended but still running. Vehige testified, "I know that if you pull up on like a suspicious area, then you're supposed to have backup and not leave your vehicle unattended." Vehige saw the same police vehicle later at a different intersection and began to tail it, wondering about a connection to the drug house. Vehige testified that, after a while, he noticed he was being tailed by a police vehicle, so he broke off tailing the police vehicle.

Later that morning, Vehige was parked at the police department, taking a break from filming and reviewing footage with his friends. He said that his friends alerted him that a uniformed individual came out of the building and was getting into a vehicle. Vehige said he turned on the car and the lights and prepared to follow or tail the vehicle briefly. He said that the route he followed when he tailed Delgadillo was the one that Delgadillo demonstrated earlier for the jury. Vehige testified that he stopped following Delgadillo because "it seemed like he was trying to go home at that point or something. I don't know what, it just—it didn't feel like he was still on duty. There's like an assertiveness to their nature when they're perusing the streets and I didn't feel like that same vibe reciprocating." Vehige denied that he intended to follow Delgadillo home.

11

Vehige testified that he had a police scanner on during the night, but the phone charger stopped working, so all of the car's passengers' phones died. He testified that at the point when he was following Delgadillo while he was off duty, the scanner was not working.

Officer Jessica Penn, a rebuttal witness for the State, testified that she was an Emporia police officer who was familiar with Vehige because she had encountered him several times since he began filming the police in July 2014. Penn testified that, initially, Vehige was calm, he would follow the police officers' instructions, and he was respectful during most interactions. Penn testified that Vehige changed as the summer progressed, and his attitude towards law enforcement became less cooperative. Penn provided the following examples of her interactions with Vehige:

- On August 5, 2014, Penn arrested an individual at a DUI stop. As she was securing the individual in her patrol vehicle, Vehige ran up to the traffic stop and began yelling at her for not giving him the keys to the arrested individual's moped. She locked the seat of the parked moped so it would be secure as Vehige stood just a few feet from her, filming and screaming about wanting Penn's name and badge number. Penn testified that when she went back to her patrol vehicle, Vehige leaned down to the open passenger-side front window and continued to yell, "[n]ame and badge number . . . [n]ame and badge number" as she rolled up the window; at that point, he started banging on the window while continuing to yell. Penn testified that Vehige was "[a]bsolutely not" calm and peaceful.

- On another occasion, while Penn was speaking to the driver of a vehicle she had stopped, Vehige and another individual were standing across the street from her, screaming, "Hands up. Don't shoot," multiple times. "They were very loud and very consistent."

12

- Penn testified that on another occasion she was with Delgadillo and a third officer conducting a nightly bar check. All three officers were on duty and in uniform; Penn was also wearing black gloves. Vehige saw her and, as the officers were walking up to the establishment, yelled, "Only killers wear black gloves. And, look, you're wearing black gloves."

Penn testified that she never arrested Vehige, even when she had cause to, such as with the moped encounter. Penn remembered the moped driver yelling Vehige's name but did not remember the driver asking Vehige to take the keys. Upon reviewing a video of the moped incident Penn testified that the video was edited and did not show the entire interaction. Penn testified that Vehige knows all the police officers by name and has shouted her name many times.

A jury convicted Vehige on March 24, 2015, of disorderly conduct, a class C misdemeanor, pursuant to K.S.A. 2014 Supp. 21-6203(a)(3), and stalking, a class A person misdemeanor, pursuant to K.S.A. 2014 Supp. 21-5427(a)(1). The trial judge sentenced Vehige to 30 days in jail for disorderly conduct and 6 months in jail for stalking, concurrent to the 30-day sentence. The court placed Vehige on 6 months of unsupervised probation with the conditions that during the term of his probation (1) Vehige have no contact with law enforcement officers unless he had an emergency and (2) he maintain a 150-foot buffer while engaged in filming law enforcement officers during the term of his probation. Vehige filed this appeal of his convictions.

WAS THERE SUFFICIENT EVIDENCE TO CONVICT VEHIGE OF DISORDERLY CONDUCT?

Vehige challenges the sufficiency of the evidence to support his conviction for disorderly conduct. When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have

13

found the defendant guilty beyond a reasonable doubt based on the evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

The State charged Vehige under the part of the disorderly conduct statute that criminalizes "using fighting words or engaging in noisy conduct tending reasonably to arouse alarm, anger or resentment in others." K.S.A. 2016 Supp. 21-6203(a)(3). Using fighting words and engaging in noisy conduct are two distinct ways of violating the statute. As defined in K.S.A. 2016 Supp. 21-6203(c), "fighting words" are those "words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of the peace." Vehige argues, in part, that his actions on August 10 essentially consisted of constitutionally protected speech and could not reasonably have aroused alarm, anger, or resentment in the officers because law enforcement personnel typically are trained to control their emotive responses to insulting or offensive conduct directed at them.

Unless it can be determined as a matter of law that a defendant's words were not fighting words, that ultimate determination is a question of fact for the finder of fact. *State v. Beck*, 9 Kan. App. 2d 459, 463, 682 P.2d 137, *rev. denied* 235 Kan. 1042 (1984). Whether Vehige was engaged in constitutionally protected speech was a question of fact that was left to the jury. In this case, the jury was provided with jury instructions that encompassed Vehige's claimed First Amendment protections.

At the trial, the State relied on the August 10 videotape of Vehige's encounter with the three off-duty officers to prove the elements of the offense of disorderly conduct. The video recording was admitted as a trial exhibit and played for the jurors. Because the video was admitted the parties did not question the witnesses in detail about Vehige's

14

statements. Vehige failed to designate the video recording as a part of the record on appeal. As a result this court has no way to evaluate whether Vehige's statements were constitutionally protected or whether the statements fall outside the definition of disorderly conduct as a matter of law. The nature of the disorderly conduct charge requires the court to closely examine Vehige's precise language and actions to measure the sufficiency of the evidence. Because the only evidence before the jury was contained on the video recording, we have no way to do that. In the absence of an appellate record sufficient to analyze Vehige's claim of error, we must affirm the jury verdict and Vehige's conviction for disorderly conduct. See *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008) (when defendant fails to designate sufficient record to show error, claim must be denied); *In re N.U.*, 52 Kan. App. 2d 561, 567, 369 P.3d 984 (2016).

WAS THERE SUFFICIENT EVIDENCE TO CONVICT VEHIGE OF STALKING?

Vehige argues on appeal that there was insufficient evidence to support his conviction for stalking because the facts fail to satisfy all the statutory requirements. Specifically, Vehige argues that there was insufficient evidence that he targeted Delgadillo and insufficient evidence that Vehige engaged in a course of conduct that was neither constitutionally protected nor necessary to accomplish a legitimate purpose.

K.S.A. 2016 Supp. 21-5427 defines stalking:

> "(a) Stalking is:
> (1) Recklessly engaging in a course of conduct targeted at a specific person which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear;
> (2) engaging in a course of conduct targeted at a specific person with knowledge that the course of conduct will place the targeted person in fear for such person's safety or the safety of a member of such person's immediate family.

15

. . . .

"(f) As used in this section:

(1) 'Course of conduct' means two or more acts over a period of time, however short, which evidence a continuity of purpose. A course of conduct shall not include constitutionally protected activity nor conduct that was necessary to accomplish a legitimate purpose independent of making contact with the targeted person. A course of conduct shall include, but not be limited to, any of the following acts or a combination thereof:

(A) Threatening the safety of the targeted person or a member of such person's immediate family;

(B) following, approaching or confronting the targeted person or a member of such person's immediate family."

To convict Vehige of stalking, the State had to prove he "recklessly" targeted Officer Delgadillo on at least two distinct occasions. Vehige's actions in each incident must have caused a reasonable person to fear for his or her safety and Officer Delgadillo must have been actually placed in fear. K.S.A. 2016 Supp. 21-5427(a)(1). The State relies on the August 10 interaction between Vehige and the three off-duty officers, including Delgadillo, as one of the required incidents. The other incident involved Vehige's actions on August 16. We put aside the August 16 incident because the incident between Vehige and Delgadillo on August 10 cannot support a violation of the stalking statute. The evidence supporting the conviction, therefore, fails as a matter of law regardless of the circumstances on August 16. The evidence is legally inadequate in at least two material respects.

First, the fear required under K.S.A. 2016 Supp. 21-5427 is the fear of physical injury or bodily harm. See *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 741, 159 P.3d 1035 (2007) ("fear" for "personal safety" necessary to establish stalking under identical language in K.S.A. 60-31a02[a] requires that victim be in "reasonable apprehension of bodily harm"). Delgadillo testified that he was "concerned" about safety as Vehige videotaped the officers and spoke with them. That is not the same as being in fear of

16

one's own safety or entertaining a reasonable apprehension of bodily harm. Nor could a factfinder reasonably infer as much from Delgadillo's stated concern. Moreover, the circumstances could not support a reasonable conclusion that Delgadillo feared for his own safety in general or that he apprehended bodily harm specifically. Vehige was alone as he videotaped the officers. He was significantly outnumbered—a fact that weighed heavily against a finding that Vehige intended to physically confront Delgadillo. Also, Vehige had no weapons, and none of the officers were concerned that he did. Finally, the officers testified that Vehige made no statements they construed to be physically threatening. The facts are insufficient to support a jury's finding that Delgadillo feared for his own safety or apprehended bodily harm.

Second, to be convicted, Vehige had to "recklessly" engage in conduct that would cause a reasonable person to whom it was directed to fear for his or her safety. As defined in the Kansas Criminal Code, a person acts "recklessly" if he or she "disregards a substantial and unjustifiable risk . . . that a result will follow." K.S.A. 2016 Supp. 21-5202(j). Based on the circumstances of the August 10 encounter, a factfinder could not reasonably conclude that someone in Vehige's position disregarded a substantial risk that the actions directed at Delgadillo would instill in the officer a fear for his own safety. As we have already outlined, there was no objectively substantial risk of that result, given the nature of the interaction and the numerical superiority of the officers.

The State, therefore, failed to present sufficient evidence of a course of conduct of stalking that would violate K.S.A. 2016 Supp. 21-5427(a)(1). Vehige's conviction for stalking must be reversed.

Affirmed in part and reversed in part.

17