NOT DESIGNATED FOR PUBLICATION

No. 118,904

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LILA ELIZABETH TIBBETTS,
*Appellee*,

v.

CARLIN WAYNE BECKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Harvey District Court; MARILYN M. WILDER, judge. Opinion filed February 22, 2019. Affirmed.

*Geoffrey W. Harrison*, of McDonald Law LLC, of Newton, for appellant.

No appearance by appellee.

Before POWELL, P.J., ATCHESON and GARDNER, JJ.

PER CURIAM: The Harvey County District Court entered an order for protection against stalking in favor of Lila Elizabeth Tibbetts and against Carlin Wayne Becker. Becker has appealed and contends that the district court's decision lacks sufficient support in the evidence. On a challenge to the sufficiency of the evidence, we review the record in a light favoring the district court's ruling. Both Tibbetts and Becker testified during the district court hearing on the petition. Especially in light of the standard of review, we find no error and affirm the entry of the order against Becker.

1

The evidence presented to the district court showed Becker and Tibbetts had been involved in a fitful romantic relationship for a year and a half to two years. They would date, break up, and begin dating again. At the hearing, Becker testified Tibbetts prompted the break-ups by seeing other men. Tibbetts testified that she initiated the break-ups but had been frightened by Becker's reactions. She told the district court Becker would fly into rages and throw things against the walls. That portion of Tibbetts' testimony was undisputed. Becker, however, never physically threatened Tibbetts directly or harmed her during those incidents.

Tibbetts said that she ended her relationship with Becker for the last time on October 26, 2017. According to Tibbetts, Becker called her daily to harass her for ending the relationship, although she did not recount the substance of those communications.

Tibbetts testified that on November 29, 2017, Becker called her 21 times while she was out with a friend. When she called him, he complained about their not getting back together. She hung up on him. Becker then called her four or five more times. On one of the calls, Becker left a message telling Tibbetts either: "I'm coming over" or "I'm on my way[.]" At the hearing, Becker confirmed the content of the message. But he denied that he intended it as a threat and characterized his words as an effort to restore their relationship. Tibbetts told the district court she interpreted the message as a failure to respect her boundaries or safety.

Becker continued to communicate with Tibbetts the next day using a messaging app. He sent Tibbetts messages threatening to tell her friends and family some unidentified information he asserted would damage her character. Tibbetts called her phone service provider and blocked Becker's access through the app. Becker then started sending text messages to Tibbetts' phone. One of the messages stated, "Ha, ha, ha, bitch."

The last message Becker sent read: "I'd leave you alone but you just had to play around with my feelings again. You shouldn't have done that." Tibbetts testified that she interpreted this message as Becker announcing an intention not to leave her alone. Becker testified at the hearing that he was hurt by Tibbetts' behavior and that, given their past relationship, he did not intend to let her go easily. He denied that he intended those messages to be threatening.

Becker claimed he sent Tibbetts text messages later that day to explain why he was hurt by Tibbetts' behavior toward him and to say he felt bad about his repeated attempts to contact her the night before. Tibbetts denied receiving these additional messages.

On December 13, 2017, Becker arranged to meet Tibbetts at a local restaurant to discuss the relationship. Becker told Tibbetts that he would stop contacting her if she would agree to meet with him. They ate dinner together at the restaurant while Becker discussed their relationship. At the hearing, Tibbetts testified Becker appeared angry during their dinner but he did not threaten or attack her. At the hearing, Becker testified that Tibbetts seemed disconnected during their meal. He described the dinner as awkward.

About a week later, Tibbetts left her workplace about 3 p.m. and discovered that Becker had left a note along with a hat she had given him in the passenger's seat of her car. The note referred to Tibbetts as a "whore" and declared she should remember who she was. Tibbetts was sufficiently unnerved that she called the Newton Police. One of the officers who responded to the call suggested Tibbetts consider filing for a protection from stalking order. The officer also called Becker and informed him that Tibbetts wanted no further contact with him. At the hearing, Becker acknowledged receiving the call but said he thought it was a hoax.

3

The other officer recommended Tibbetts send a final communication to Becker clearly stating she considered their relationship at an end. Tibbetts sent an e-mail to Becker. He responded with two return e-mail messages. The first stated simply, "Fuck off." The second was more elaborate: "After the shit you just pulled, you shouldn't be contacting me either. You know what you are. Stay away from me forever." At the hearing, Tibbetts testified that she considered the e-mail messages to be threatening. On December 20, the day after their e-mail exchange, Tibbetts filed a petition for a protection from stalking order against Becker. The district court entered a temporary order against Becker on December 20 pending a hearing on the petition. Becker was served with the notice of hearing and the temporary order on December 22.

Tibbetts represented herself at the district court hearing on January 5, 2018. Becker appeared with a lawyer. The district court entered a final order immediately following the hearing. Becker duly appealed. Tibbetts has not filed an appellate brief.

LEGAL ANALYSIS

The Kansas Protection from Stalking Act, K.S.A. 2018 Supp. 60-31a01 et seq., governs the petition Tibbetts filed and the order the district court issued. To obtain an order under the Act, the petitioner (here, Tibbetts) must prove by a preponderance of the evidence that the defendant (here, Becker) has engaged in stalking, defined as "intentional harassment" causing the petitioner to be "in reasonable fear for [his or her] safety." K.S.A. 2018 Supp. 60-31a05(a) (preponderance standard); K.S.A. 2018 Supp. 60-31a02(d) (definition of stalking). In turn, "harassment" means a "[c]ourse of conduct . . . consisting of two or more separate acts . . . [that] would cause a reasonable person to suffer substantial emotional distress." K.S.A. 2018 Supp. 60-31a02(d)(1), (2). The harassment must be intentionally directed at a specific person and be of a kind "that seriously alarms, annoys, torments or terrorizes" that person and "serves no legitimate purpose." K.S.A. 2018 Supp. 60-31a02(d)(1).

4

Under the Act, "reasonable fear" entails subjective and objective components. That is, the petitioner must actually be fearful—the subjective aspect—and the circumstances must be such that a reasonable person would likewise be fearful—the objective component. And the fear must relate to the petitioner's safety. In this context, "safety" refers to insulation from physical injury or harm. See *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 741, 159 P.3d 1035 (2007). The *Wentland* court held that the "fear" for "personal safety" necessary to establish stalking under the Act requires the petitioner be in "reasonable apprehension of bodily harm." 37 Kan. App. 2d at 741.

Although Becker attempts to frame his appellate challenge as a question of law, it really rests on the sufficiency of the evidence in satisfying the legal standards for an order. He does not contend the district court misunderstood the controlling law.

We apply a mixed standard of review and will uphold a district court's findings of fact if they are supported by substantial competent evidence. We then ask whether those facts warrant the district court's legal conclusions—determinations over which we exercise unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014) (mixed standard generally); *Redondo v. Gomez*, No. 109,642, 2014 WL 802268, at *2 (Kan. App. 2014) (unpublished opinion) (review of order under Protection from Stalking Act). Substantial competent evidence is sufficient to reasonably permit or support a given factual conclusion. *Gannon*, 298 Kan. at 1175. In making that review, we do not reweigh evidence or pass on the credibility of the witnesses. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1195, 221 P.3d 1130 (2009); *Hodges v. Johnson*, 288 Kan. 56, Syl. ¶ 7, 199 P.3d 1251 (2009) (An appellate court reviews a district court's findings of fact only to determine if they are supported by competent evidence and will not make credibility determinations or reweigh conflicting evidence.). If the evidence, thus considered, supports the judgment, we will not reverse for insufficient evidence.

Here, the evidence established a course of conduct on Becker's part consisting of repeated communications with Tibbetts after she broke up with him. The conduct entailed communications Becker directed at her through various mediums. It also included his entry into Tibbetts' car to return the hat she had given him with a note she found sufficiently disturbing that she contacted the police.

The content of the communications would reasonably cause substantial emotional distress and serious alarm or annoyance, satisfying the statutory definition of harassment through a course of conduct. We needn't restate all of the facts. But Becker, among other things, announced he would ruin Tibbetts' reputation with her family and friends, referred to her as a "whore" and a "bitch" in separate communications, and threatened to come to her home after he attempted to call more than 20 times over the course of an evening. The district court's conclusions on those points is supported by substantial competent evidence.

The closer question is whether the evidence supports the requisite finding of "reasonable fear." There is little question Tibbetts subjectively feared for her physical safety. She told the district court Becker's conduct left her "rather frightened." And she described Becker as having become "enraged" in reaction to the earlier break-ups to the point he would "throw anything within reach against the walls" as he yelled at her. During the course of the final break-up, Becker made at least one statement to the effect he would come to her home. We find Becker's threat to besmirch Tibbetts' reputation to be significant—not because it was physically threatening but because it evinced a malevolent and vengeful attitude that could easily escalate. Becker eventually did invade Tibbetts' personal property by leaving the hat and note in her car. That proved to be the proverbial last straw. Tibbetts characterized the incident as "a huge escalation" from the text messages and other electronic communications.

6

The constellation of events, extending over nearly two months, was sufficiently persistent and aggressive to provide substantial evidence to support an objectively reasonable fear of physical danger or harm. The frequency of the communication and its vitriol displayed obsessiveness combined with animosity—a mix that reasonably could be viewed as potentially explosive. We are not offering an informed psychological assessment; there was no such expert testimony offered at the hearing. Rather, we are simply looking at how a reasonable person on the receiving end might view Becker's conduct. The backdrop of Becker's violent reactions to the earlier break-ups contributes significantly to the picture even though that violence was narrowly directed at objects. Becker displayed a volcanic temperament in Tibbetts' presence, demonstrating what he could be capable of if crossed.

In sum, given the standard we must apply, the record contains substantial evidence supporting the requisite factual bases for a protection from stalking order. We cannot reweigh that evidence. In turn, we find no fault with the district court's legal conclusion to enter the order.

Becker offers various rejoinders. He points to his testimony that he did not intend to threaten Tibbetts' physical safety. But the defendant's intent in undertaking the course of conduct is irrelevant under the Act. What matters is the petitioner's objective and subjective reaction to the course of conduct. He also suggests Tibbetts couldn't have feared him, since she agreed to have dinner with him at a local restaurant. But Becker induced her to agree by suggesting he would leave her alone if she would meet with him. And they met in a public place of relative safety. More to the point on appeal, that argument really calls on us to reweigh the evidence.

Becker also cites *Manford v. Young*, No. 114,538, 2016 WL 4413493 (Kan. App. 2016) (unpublished opinion), to support his argument that Tibbetts offered insufficient evidence to support her petition. But *Manford* is inapposite. In that case, Manford sought

an order under the Act against Young, his ex-wife. Manford believed Young was responsible for a continuing stream of anonymous phone calls, text messages, and other communications he found upsetting. She also sent him some identifiable messages he similarly considered disturbing. But Manford expressly testified at the hearing that he did not fear for his personal safety as a result of the communications. Despite that testimony, the district court entered an order against Young. This court reversed because Manford's clear and unequivocal testimony negated a statutory requirement for an order. 2016 WL 4413493, at *2. So the district court in that case committed plain legal error, given Manford's testimony. This case has no comparable evidence. Tibbetts never testified she had no fear for her personal safety. The gist of her testimony was just the opposite, although she may not have said as much in a single declarative sentence during the hearing.[*]

[*]Because Tibbetts represented herself at the hearing, the district court had her present her direct testimony in an unbroken narrative recitation. There was no one to ask her questions to develop or guide her account. Becker's lawyer then cross-examined Tibbetts in the common question and answer format. The lawyer did not ask an open-ended question that would have elicited Tibbetts' state of mind as to her personal safety. We have reviewed the transcript, and Tibbetts' testimony shows her to have been fearful of her safety, especially after Becker invaded her car to leave the note and hat.

The evidence sufficiently supported the essential facts for the protection from stalking order the district court entered against Becker. Becker has failed to show any error in the district court's decision.

Affirmed.