NOT DESIGNATED FOR PUBLICATION

No. 117,471

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ERIKA CORDOVA,
*Appellee*,

v.

MICHELLE COLDIRON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CLARK V. OWENS II, judge. Opinion filed December 1, 2017. Affirmed.

*David L. Miller*, of Ney, Adams & Miller, of Wichita, for appellant.

*Paul S. McCausland* and *Bradley R. Ward*, of Young, Bogle, McCausland, Wells & Blanchard, P.A., of Wichita, for appellee.

Before GARDNER, P.J., GREEN, J., and MERYL D. WILSON, District Judge, assigned.

PER CURIAM: Erika Cordova filed a petition for protection from stalking order under K.S.A. 60-31a01 et seq., alleging that Michelle Coldiron was stalking her. Cordova's petition was temporarily granted. After the case went to trial, Cordova was granted a final protection from stalking order. The order was based on three alleged separate incidents of stalking, one occurring on February 7, 2017, and two occurring on February 9, 2017. Coldiron appeals the final order, arguing (1) that insufficient evidence existed to support the trial court's ruling that the February 7, 2017 incident constituted an

1

act of stalking; (2) that the trial court erred as a matter of law in ruling that the February 9, 2017 incidents constituted two separate acts of stalking; and (3) that the trial court erred in admitting evidence relating to Michelle Coldiron's husband's conduct.

The ultimate question is whether the trial court properly concluded that Coldiron had committed two or more separate acts of stalking directed at Cordova. We conclude that the trial court properly determined that two separate acts of stalking directed at Cordova occurred on February 9, 2017. Accordingly, we affirm.

Erika Cordova was born in Mexico City, Mexico. Cordova is now a crew chief in the graphite assembly department for Textron Aviation in Wichita, Kansas. She has worked for Textron, or its predecessors, for 21 years. Cordova oversees the assembly of flaps, trim tabs, and other graphite component parts for airplanes.

Michelle Coldiron has also worked in the graphite assembly department at Textron Aviation. She has worked for Textron, or its predecessors, for 13 years. Apart from her assembly duties, Coldiron has also had the responsibility of being a union safety advocate. She is responsible for making sure that the safety interests of the employees are being met and that the employees are complying with safety regulations.

When Cordova experienced problems working with Coldiron, she told Textron her difficulty working with Coldiron. Textron provided Cordova with security escorts to and from her car when she worked. Eventually, a Textron security guard recommended that Cordova file a petition for protection from stalking against Coldiron. On February 21, 2017, Cordova petitioned the trial court for a protection from stalking order under K.S.A. 60-31a01 et seq. Cordova alleged that on three separate dates, Coldiron threatened and harassed her. When Cordova filed her petition from stalking, the trial court granted her a temporary order of protection from stalking.

On March 22, 2017, a bench trial was held on Cordova's petition for protection from stalking. Coldiron's therapist, Meredith Miller, testified that she had treated Coldiron and her husband as a couple from April 20, 2016, to September 1, 2016. Coldiron sought out counseling services after discovering that her husband had been unfaithful to her. Coldiron's husband cheated on her nearly 15 years ago with Cordova's sister.

At the trial, Cordova expanded on the allegations made in her petition. Cordova first alleged that on January 31, 2017, she was performing morning stretching exercises with her team when Coldiron told her that she should put her hair in a ponytail because there were several people after her and she "should not give them that chance." Textron has a safety policy that mandates workers with long hair must wrap up or place their hair in a ponytail to prevent work-related injuries. Cordova testified that she was surprised by Coldiron's comment. The comment made her fearful of Coldiron.

Coldiron offered a different explanation of the ponytail incident. Coldiron testified that she had the conversation with Cordova in her capacity as a union safety advocate. Coldiron testified that she told Cordova to put her hair in a ponytail for her safety. She warned Cordova that other workers could make an issue out of the fact that she was not complying with safety regulations. At trial, Coldiron established that she was not at work on January 31, 2017. Cordova testified that the incident actually occurred on February 7, 2017. Cordova produced a written statement that she had turned in to Textron that confirmed that the incident occurred on February 7, 2017. Cordova testified that she mixed up the dates when she was filling out her petition because she did not refer to her written statement. Both January 31, 2017, and February 7, 2017, were Tuesdays. She testified that she simply picked the wrong Tuesday.

Next, Cordova alleged that on February 9, 2017, Coldiron wanted to speak with her about a "flap procedure" that pertained to a specific job task in the graphite assembly

3

department. Coldiron took Cordova to a private room. Initially, Coldiron showed Cordova how to complete the flap procedure. The conversation turned, however, and Coldiron told Cordova that a group of coworkers, including herself, were "out to get" her. Coldiron told Cordova that she should read chapter 34 of her union handbook to prepare for what was coming to her. Chapter 34 of the union handbook covers crew chief duties and responsibilities. Coldiron then held her hands up in a choking fashion as she told Cordova that she hated her. Cordova testified that when Coldiron put her hands up, she was placed in extreme fear. Coldiron told Cordova that her body convulsed when she saw her because she was a reflection of her sister, who had an affair with Coldiron's husband. Coldiron told Cordova, "I hate you. I hate you." She also told Cordova that she hated all Hispanic people. Coldiron was within one foot of Cordova, so Cordova began to back away. She was fearful of Coldiron. As Cordova backed away, Coldiron showed her a cell phone video of her hands shaking. She told Cordova that her entire body felt that way when she saw her. Coldiron expressed her "desire for physical violence against" Cordova. She told Cordova that she wanted to kick her and her sister's asses.

Cordova left the private room where she was talking with Coldiron and returned to her work area. Coldiron went to Cordova's work area and once again told Cordova that she hated her. Cordova attempted to continue with her work and to ignore Coldiron. But Coldiron continued to express her hatred for Cordova. Coldiron again showed Cordova the cell phone video of her hands shaking and made choking motions with her hands toward Cordova. When Cordova did not react, Coldiron left Cordova's work area. Cordova stated that the February 9, 2017 situation caused her to feel unsafe in her workplace. Cordova testified that the incident caused her to cry. She reported the incidents to Textron management the same day that they occurred.

On the other hand, Coldiron offered a different explanation for the February 9, 2017 events. Coldiron testified that Cordova actually initiated the conversation about the flap procedure. Coldiron stated that Cordova asked her to walk her through the

4

procedure. Coldiron testified that Cordova was having issues with an operator in the flap area, which would explain why she asked Coldiron for help instead of the operator in the flap area. Coldiron testified that she went to a private room with Cordova and showed her the flap procedure. She stated that the conversation probably lasted around 30 minutes. Coldiron produced a witness who testified that she saw Coldiron and Cordova having a conversation in the private room. The witness testified that she did not see any anger in either Coldiron or Cordova. The witness testified that it looked as though they were having a normal conversation.

Coldiron testified that after they went through the flap procedure, Cordova turned the conversation to talking about her personal issues with the operator in the flap area. Coldiron denied ever making any statement that there were workers out to get Cordova. She further denied that she identified herself as one of the people who wanted to get Cordova. She testified that she only brought up chapter 34 of the union handbook to warn and to remind Cordova that individual performance was not part of her duties as a crew chief. Coldiron wanted Cordova to know that she could get in trouble if she reported the operator in the flap area for poor work performance. Coldiron denied all of Cordova's other allegations. She denied telling Cordova that she hated all Hispanic people. Coldiron testified that she has various Hispanic family members. Coldiron testified that she hugged Cordova. She testified that when they left the private room, Coldiron continued to talk to Cordova. She stated that she showed Cordova pictures of her grandchildren on her phone. Coldiron further testified that the conversation ended and she left to take a cigarette break.

At trial, three Textron employees corroborated at least part of Cordova's version of the events that occurred on February 9, 2017. The first witness testified that he saw Cordova and Coldiron having a "heated discussion" at Cordova's desk as he walked through the work area. He testified that the conversation did not look cordial and that it looked as though Cordova "was being scolded." The witness further testified that

5

Cordova's face was red and she appeared visibly upset—"like she was about to cry or [had] been crying." The first witness did not see Coldiron make any threatening moves towards Cordova. The second witness testified that she saw Coldiron approach Cordova and leave the work area for 20-30 minutes. She testified that Cordova and Coldiron returned to Cordova's work area and continued talking. She saw Coldiron talking angrily toward Cordova, who was not responding. The second witness testified that Coldiron moved her hands "like a tiger . . . [g]rabbing something." She testified that when Coldiron left, Cordova was crying. The third witness testified that he saw Coldiron showing Cordova something on her cell phone while they were at Cordova's desk.

Cordova also admitted into evidence a Textron security department report covering the incident that occurred on February 9, 2017. The report, later marked "Exhibit 8," contained the following information: On February 17, 2017, Textron investigated the February 9, 2017 incident. As part of the investigation, Textron interviewed Cordova and Coldiron. During Cordova's interview, she "appeared to be very upset and scared." During Coldiron's interview, she "appeared to be very upset that she was being brought to be interviewed." Coldiron "avoided talking about the incident in question always trying to turn the question to something else." When asked directly about the threats, Coldiron "turned away and avoid[ed] the answer trying to pass the fault onto [Cordova]." Coldiron showed the investigators the video of her hands shaking. She explained "that she showed [Cordova] the video and explained this is how she felt every time she would see [Cordova]." Still, she denied making any threats.

Cordova also alleged that on February 15, 2017, Coldiron asked her if she had any safety glasses. Cordova told Coldiron that she did not have any safety glasses. Coldiron told Cordova that she would order her some glasses. She then warned Cordova that she better not be turning people in for poor work performance or else she would turn Cordova's supervisor in for encouraging such action. Coldiron told Cordova that if she wanted to know her rights, she could speak to Coldiron's husband. Coldiron's husband

6

was the union steward for the graphite assembly department. Cordova reported the incident to Textron management. Cordova testified that the incident caused her to fear for her life.

While testifying, Cordova acknowledged that Coldiron had a legitimate safety concern in asking her whether she had safety glasses. Coldiron testified that she only stopped by Cordova's desk on February 15, 2017, to give her a pair of new safety glasses. She testified that after she gave her the safety glasses, she left. Coldiron denied making any statement about turning Cordova's supervisor in. Coldiron testified that her actions on February 15, 2017, were consistent with her responsibilities as a union safety advocate. Another witness confirmed that the team had a safety meeting the morning of February 15, 2017, at which Textron stressed the importance of eye protection. Indeed, another witness confirmed that it was Coldiron's duty as a union safety advocate to ensure that employees were complying with safety regulations.

During closing arguments, Cordova's attorney acknowledged that the case came down to credibility—as both parties offered different accounts of the alleged incidents. Cordova's attorney argued that corroborating evidence existed to support her version of the incidents, while no corroborating evidence existed to support Coldiron's version. Coldiron's attorney also argued that the case came down to credibility. He argued that evidence was introduced that contradicted Cordova's version of the incidents. Coldiron's attorney further argued that a reasonable person in Cordova's circumstances would not have felt that their safety was being threatened.

The court concluded the trial and took the evening to review the evidence and testimony. It reserved its decision for the following day. On March 23, 2017, the trial court went through the law covering the issue. The court considered each of the alleged incidents. The trial court ruled that the February 9, 2017 incident was actually two incidents—one occurring in the private room and the other occurring at Cordova's desk.

7

The court further ruled that the contacts between Cordova and Coldiron, which took place on February 9, 2017, were "sufficient to create fear in a reasonable person's mind." The court further ruled that the February 7, 2017 incident could be interpreted as having had a legitimate purpose—if it was considered in a vacuum. But the court found that when the incident was viewed in context of the February 9, 2017 incident, Coldiron's statements on February 7, 2017, could be interpreted as a physical threat. In regard to the February 15, 2017 incident, the trial court ruled that Coldiron did not make "a physical threat of any kind" on that date.

In the end, the trial court acknowledged that the case came down to a credibility determination. In short, the trial court found that Cordova's witnesses were more credible than Coldiron's witnesses. Thus, the court granted Cordova's final order of protection from stalking for one year. The order was to remain in effect until March 23, 2018. Coldiron filed a timely notice of appeal.

We turn now to the meaning of "protection from stalking" as used in K.S.A. 2016 Supp. 60-31a02.

"What's considered stalking under the Protection from Stalking Act, K.S.A. 60-31a01 *et seq.*, is set out in three interrelated definitions—covering the terms 'stalking,' 'harassment,' and 'course of conduct.' 'Stalking' is the 'intentional harassment of another person that places the other person in reasonable fear for that person's safety.' K.S.A. 2016 Supp. 60-31a02(a). 'Harassment' is 'a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose.' K.S.A. 2016 Supp. 60-31a02(b). And a 'course of conduct' is 'conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress.' K.S.A. 2016 Supp. 60-31a02(c). The statute also contains a provision excluding 'constitutionally protected activity' from the definition of course of conduct. (We've omitted provisions defining the use of drones to surveil others, which can constitute stalking. See K.S.A. 2016 Supp. 60-31a02[d].)

8

"Based on these statutory definitions, a valid stalking claim (not involving the use of an aerial drone) would require proof of the following:

- At least two separate acts;
- Directed at a specific person;
- Intentionally done;
- Showing a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress;
- Placing the person in reasonable fear for his or her safety;
- Through conduct that seriously alarmed, annoyed, tormented, or terrorized the person; and
- That served no legitimate purpose and was not constitutionally protected.

"As with other civil cases, these facts need only be proved by a preponderance of the evidence, meaning it is more likely than not that the facts are true. See K.S.A. 2016 Supp. 60-31a05(a)." *C.M. v. McKee*, 54 Kan. App. 2d 318, 321-22, 398 P.3d 228 (2017).

The Protection from Stalking Act ("the Act") states that it "shall be liberally construed to protect victims of stalking and to facilitate access to judicial protection for stalking victims." K.S.A. 60-31a01(b).

*Did Sufficient Evidence Exist to Find that the February 7, 2017 Incident Constituted an Act of Stalking?*

Coldiron argues that the February 7, 2017 incident is insufficient on its own or in the context of the February 9, 2017 incidents to constitute an act of stalking. Even so, we need not determine whether the February 7, 2017 incident constituted an act of stalking if the February 9, 2017 incidents were properly deemed two separate acts of stalking. Because the Act only requires two separate acts, we will first address the February 9, 2017 incidents to determine if the trial court's stalking ruling is correct.

9

*Did the Trial Court Err in Ruling that the February 9, 2017 Incidents Constituted Two Separate Acts of Stalking?*

As was mentioned earlier, to succeed at trial Cordova was required to show by a preponderance of the evidence that Coldiron had intentionally committed two separate acts which were directed at her. In addition, Cordova needed to show that the two separate acts had a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress, that she was placed in reasonable fear for her safety by way of seriously alarming, annoying, tormenting, or terrorizing conduct, and that the acts served no legitimate purpose and were not constitutionally protected. See K.S.A. 2016 Supp. 60-31a02(b)-(c).

The trial court ruled that two separate acts occurred on February 9, 2017, which were sufficient to support the final protection from stalking order. The trial court ruled that the first act occurred in the private room after Cordova and Coldiron went over the flap procedure, and that the second act occurred at Cordova's desk after she retreated from the private room.

Coldiron argues that the trial court erred because "[t]he February 9 incident cannot constitute two separate acts as a [matter] of law." Cordova, on the other hand, argues that Coldiron committed two separate acts of stalking on February 9, 2017, because K.S.A. 2016 Supp. 60-31a02 clearly states that the separate acts may occur over a period of time, *however short*.

Again, we review the trial court's ruling using a bifurcated standard of review. We review the trial court's factual findings using a substantial competent evidence standard and its conclusions of law using a de novo standard. *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 736, 159 P.3d 1035 (2007). Here, both parties' arguments implicate the

10

interpretation of "separate acts" as found in the definition of "course of conduct" in K.S.A. 2016 Supp. 60-31a02(c).

The interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The foremost rule of statutory interpretation is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). In analyzing a statute for the Legislature's intent, this court begins with the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, this court will not speculate about the legislative intent behind the statute's clear language and will not read something into the statute that is not readily found therein. 304 Kan. at 409.

Here, we are specifically concerned with K.S.A. 2016 Supp. 60-31a02(c), which defines "course of conduct" as "conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress."

Coldiron acknowledges that she was "unable to find a Kansas case directly addressing this specific issue." As a result, she cites to three cases from other jurisdictions—Washington, California, and Louisiana—in support of her argument. On the other hand, Cordova argues that when viewed in light of the Act's overriding provision that it is to be construed liberally, the plain language of K.S.A. 2016 Supp. 60-31a02(c) shows that the two incidents on February 9, 2017, were sufficiently separate to constitute separate acts.

Our research has revealed no Kansas case in which the "separate acts" language under K.S.A. 2016 Supp. 60-31a02(c) has been interpreted. For this reason, we will

11

consider if Coldiron's three cases are helpful in determining the statutory meaning of "separate acts" under K.S.A. 2016 Supp. 60-31a02(c).

First, Coldiron argues that *City of Seattle v. Meah*, 297 P.3d 69 (Wash. Ct. App. 2011), provides guidance on the issue. In *Meah*, the Washington Court of Appeals reviewed the sufficiency of the evidence supporting a conviction for stalking in violation of a Seattle municipal criminal ordinance. Vera Galbreath was riding a city bus when Meah asked her if he could sit next to her. Galbreath told him no, but Meah continued to talk to her. Galbreath ignored Meah and closed her eyes. Meah slapped her knee to get her attention. When Galbreath got off the bus, Meah followed her. He continued to try to talk to Galbreath for two blocks, even as Galbreath waved him away. Eventually, a passer-by called 911. Meah was convicted of one count of stalking.

The municipal ordinance that Meah was convicted under stated that "a person commits stalking when he 'intentionally and repeatedly harasses or follows another person.' [Citation omitted.]" 297 P.3d at 70. The ordinance defined "repeatedly" as "'on two (2) or more separate occasions.' [Citation omitted.]" 297 P.3d at 70. The ordinance did not define "separate occasions," but Washington's Supreme Court had considered the term's meaning in the context of the State's nearly identical stalking statute. The Washington Supreme Court defined "separate occasions" as "'distinct, individual, noncontinuous occurrences or incidents.' [Citation omitted.]" 297 P.3d at 71. Applying that definition to Meah's actions, the Washington Court of Appeals held that insufficient evidence existed to support Meah's conviction. Specifically, the court held that "no reasonable jury could find that Meah's conduct constituted more than a single, continuous episode of following" because there had not been a "break in visual contact and physical proximity." 297 P.3d at 72. The court also held that "[b]ecause the change in venue from the bus to the street did not create any break in Meah's continuous pattern of conduct, the evidence was insufficient to support a determination that Meah harassed Galbreath on two or more separate occasions." 297 P.3d at 73.

12

Nevertheless, the ordinance in *Meah* did not contain the statutory language there must be a "break in visual contact and physical proximity." The Washington Court of Appeals seems to have read this unstated statutory requirement into the municipal ordinance. This would clearly violate our plain meaning rule: We are to refrain from reading something into the statute that is not readily found in its words. *Ullery*, 304 Kan. at 409.

Next, Coldiron argues that *People v. Burton*, No. B183291, 2006 WL 3012983 (Cal. Ct. App. 2006) (unpublished opinion) also offers persuasive guidance on the issue. In *Burton*, the California Court of Appeals reviewed a stalking conviction.

"[T]he evidence at trial showed that at about 12:15 p.m. on February 26, 2004, Anna Guzzetti drove from her Rancho Vista workplace to a Target Store, and shopped for about half an hour. As she began to leave the Target parking lot, Ms. Guzzetti noticed a blue Chevrolet Suburban. When she departed the lot, the vehicle drove right behind and close to hers. Ms. Guzzetti was not concerned; she thought the driver, like her, simply wanted to traverse to the adjacent shopping center.

"In that center, Ms. Guzzetti parked near a shoe store she wished to visit. When she emerged from it and reached her car, she noticed the Suburban drive by. Wearing sunglasses and with his window down, the driver (appellant) was looking at her. As Ms. Guzzetti left the second lot, she saw the Suburban following her again, and she became afraid. She turned and proceeded down a street. The Suburban followed her, 'almost,' in her words, tailgating. Instead of turning toward her home, Ms. Guzzetti crossed into a left turn lane. Appellant moved there too. Ms. Guzzetti speedily turned into a small shopping center, in which a friend of hers ran a salon, which was always crowded. She parked and hurried to the salon. After she reached it, she saw the Suburban enter the parking lot. She asked her friend to watch for the Suburban, and eventually was told that it had left. Ms. Guzzetti then proceeded home and called police.

"Ms. Guzzetti estimated she had driven two to three miles between the shoe store and the salon. The entire incident, following her leaving Target, took at most 15 minutes." 2006 WL 3012983, at *1.

13

The California statute that the defendant was convicted under defined "course of conduct" as "'two or more acts occurring over a period of time, however short, evidencing a continuity of purpose.'" 2006 WL 3012983, at *4. The California court interpreted that provision "as contemplating more than a continuous, closely-spaced series of identical acts, with a single purpose." 2006 WL 3012983, at *4. Thus, the court held that insufficient evidence existed to support the defendant's stalking conviction. 2006 WL 3012983, at *4.

Nonetheless, like *Meah*, the *Burton* court seems to have read an unstated statutory requirement into its stalking statute, which violates our plain meaning rule.

Finally, Coldiron argues that *State v. Rico*, 741 So. 2d 774 (La. Ct. App. 1999), provides useful guidance for our analysis. In *Rico*, the Court of Appeals of Louisiana was asked to determine whether sufficient evidence existed to support Rico's conviction for stalking for "repeated following." 741 So. 2d at 775.

> "On the evening of March 16, 1997, eighteen year old Suzanne Duhon ('Suzanne'); her three-month-old daughter, Abby; and her mother, Charlotte Duhon ('Ms. Duhon'), returned from a trip to Wal-Mart in Marksville, Louisiana to Ms. Duhon's apartment in Simmsport, Louisiana. As they were unloading packages from Suzanne's vehicle, two men in a pickup truck passed. As the truck passed, the driver leaned out and hollered 'Hey Baby.' The driver was identified by Suzanne and Ms. Duhon as the Defendant.
> "After unloading the packages, Suzanne returned to her vehicle preparing to go to her home a few blocks away. The Defendant pulled his truck to the stop sign at the end of Ms. Duhon's road, made a right turn, and then pulled over on the side of the road. As Suzanne passed the Defendant by the side of the road, he pulled behind her and began following her.
> "Ms. Duhon noticed the Defendant pull behind Suzanne and she became concerned. Consequently, Ms. Duhon ran to her vehicle to follow Suzanne and the Defendant.

14

"Upon noticing the Defendant following her, Suzanne turned onto a side road to go to her home. When she reached her home, Suzanne ran inside and yelled to her thirteen-year-old brother, Jeffery Duhon, to get into her car. Suzanne then drove out of her driveway. The Defendant turned his vehicle around and proceeded to follow Suzanne. In an attempt to lose the Defendant, Suzanne turned behind a fish market. When she pulled around the fish market, the Defendant proceeded behind her.

"At this point, Ms. Duhon caught up with her daughter and yelled for her to go to Dan and Evelyn's Café in Simmsport to call the police. Suzanne proceeded to the café located on Highway One and the Defendant proceeded to Martin Luther King Drive. Ms. Duhon continued to follow the Defendant and recorded his license plate number. The Defendant then stopped, exited his vehicle and inquired if Ms. Duhon had a 'f problem.' Ms. Duhon then left to meet her children at the café. The entire incident lasted five (5) to ten (10) minutes." 741 So. 2d at 775-76.

When Rico was convicted, in Louisiana a stalking conviction required a showing of a "pattern of conduct" which meant "a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person." 741 So. 2d at 776. The court held that Rico's conduct "was a continuous following which occurred once. Thus, viewing the word 'repeated' in its usual sense and resolving any doubt or ambiguity . . . in favor of the Defendant, the State failed to prove the Defendant's conduct was a 'repeated' following." 741 So. 2d at 777.

Coldiron argues that just like in *Meah* and *Burton*, her conduct on February 9, 2017, "was a continuous, uninterrupted course of conduct that continued from the separate room to [Cordova's] work space." Coldiron argues that because her actions on February 9, 2017, constituted a continuous course of conduct, the trial court's ruling that they constituted two separate acts was erroneous.

But we note, as Coldiron points out in her brief, that the statutes analyzed in *Meah*, *Burton*, and *Rico* are also distinguishable from our case in that they were all criminal statutes. The Kansas stalking statute at issue here is a civil statute. For prosecutions under

criminal statutes, the allegations must be proven beyond a reasonable doubt. See *The State v. Bridges*, 29 Kan. 138, 141-43 (1883). As we have already established, though, the burden of proof under the Kansas civil stalking statute is by a preponderance of the evidence—which means that something is more likely true than not true. See *State v. Barlow*, 303 Kan. 804, 810, 368 P.3d 331 (2016).

Accordingly, as the courts in *Meah*, *Burton*, and *Rico* were all reviewing criminal convictions, they were reviewing those convictions for a much higher standard of proof. Here, we are analyzing the Kansas statute under a much lower standard of proof— preponderance of the evidence. Although the burden of proof is not an indication in and of itself of the Legislature's intent regarding the language of the statute, it can give us a hint as to which lens to view the language through. For example, were we interpreting a criminal statute, we would be guided by the rule of lenity which states that criminal statutes should be strictly construed in favor of the accused. See *Barlow*, 303 Kan. at 813. Indeed, in *Rico*, the Louisiana court expressly applied the rule of lenity in issuing its holding. See *Rico*, 741 So. 2d at 777 ("Thus, viewing the word 'repeated' in its usual sense *and resolving any doubt or ambiguity of the statute in favor of the Defendant*, the State failed to prove the Defendant's conduct was a 'repeated' following.") [Emphasis added.])

But here we are not bound by the rule of lenity. In actuality, the Act itself provides us a sort of anti-lenity directive in K.S.A. 60-31a01(b) where it states that "[t]his act shall be liberally construed to protect victims of stalking and to facilitate access to judicial protection for stalking victims." As a result, Coldiron's reliance on *Meah*, *Burton*, and *Rico* is misplaced.

We are also wary of Coldiron's argument that *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), provides us with a workable definition of "separate." In *Schoonover*, our Supreme Court set out some factors to be used in determining whether criminal

16

conduct constituted multiple acts or the same conduct for the purpose of unanimity jury instructions. 281 Kan. at 497. But again, as with the cases from the other jurisdictions, the *Schoonover* court was focused on criminal conduct under the analytical framework of a double jeopardy argument. Thus, the factors from *Schoonover* are of little help to our current situation. Moreover, the *Schoonover* holding concerned an instruction issue in contrast to a statutory construction issue in this case.

Returning to the Act's guiding directive that it be liberally construed, we begin with the plain language of the statute. We are particularly focused on the meaning of "two or more separate acts over a period of time, however short," in K.S.A. 2016 Supp. 60-31a02. The word at issue here is "separate." In its most plain and ordinary meaning, "separate" means "individual; distinct; particular; disconnected." Black's Law Dictionary 1571 (10th ed. 2014.) Common sense provides that in the context of the stalking statute it means the same. Moreover, instead of substituting our own interpretation of what the word might mean—as the court in *Meah* did in holding that the word "repeatedly" required a "break in visual contact and physical proximity"—we are required to determine what the Legislature intended the phrase "two or more separate acts over a period of time, however short" means, giving common words their ordinary meaning.

Again, K.S.A. 2016 Supp. 60-31a02(c) clearly states that "'[c]ourse of conduct' means conduct consisting of two or more separate acts over a period of time, *however short*, evidencing a continuity of purpose . . . ." (Emphasis added.) The "however short" language makes it clear that the required separation need not be substantial. The "however short" language also aligns with the Act's guiding directive that it should be liberally construed in favor of stalking victims.

Coldiron argues that the February 9, 2017 incidents cannot constitute two separate acts *as a matter of law*. She argues that even though the conduct here occurred in two different locations, the evidence presented at trial indicate that the conduct was

17

continuous and not separate. Specifically, Coldiron points to the language used in Cordova's petition and at trial—pointing out instances where Cordova used the words "continues" and "continued" to describe the events of February 9, 2017, that occurred in the private room and at her desk. We will review these arguments under the same bifurcated standard of review discussed earlier—reviewing the trial court's factual findings for substantial competent evidence and its legal conclusions de novo.

First, we must recognize that although Cordova has been in the United States for about 20 years, she was born in Mexico City, Mexico. The record clearly shows that Cordova still encounters difficulties expressing herself in English in certain situations. Moreover, Cordova filed her petition without the help of counsel. A person without legal training would not be mindful of what ramifications certain language used in a petition may have on the outcome of potential litigation. Accordingly, we place little weight on the actual language used by Cordova.

Instead, we look to the evidence relied on by the trial court in coming to its conclusion that the February 9, 2017 incidents constituted two separate acts of stalking. The trial court stated that "I do think that because of the retreat and going back to the desk and then re-initiation that that was sufficient to constitute a second incident." The evidence put on at trial showed that after Cordova and Coldiron had a conversation in the private room, Cordova disengaged from the conversation, leaving the room and returning to her desk. Coldiron then approached Cordova at her desk and once again initiated contact. This version of events was confirmed, at least in part, by two other witnesses at trial. Although the facts were disputed, we will not reweigh the evidence or reassess the credibility of witnesses on appeal. *Wentland*, 37 Kan. App. 2d at 736. The trial court made its credibility determination, and the factual findings it relied on were supported by substantial competent evidence.

18

Based on our definition of "separate," we hold that the trial court's legal conclusion was not erroneous. The two instances on February 9, 2017, were distinct, separated by location, and the passage of time, *however short*. The evidence supports the trial court's factual finding that Cordova ended the conversation in the private room and retreated to her desk, thus *separating* the two incidents.

This application of the statute is in harmony with the Act's overriding directive that it be construed liberally to protect victims of stalking and provide them with judicial protection. Moreover, the application of the statute is in harmony with the plain meaning rule. Accordingly, the trial court did not commit legal error in concluding that the February 9, 2017 incidents constituted two separate acts which satisfied the statutory definition of "course of conduct" in K.S.A. 2016 Supp. 60-31a02(c).

*Did the Trial Court Err in Admitting Evidence Relating to Coldiron's Husband's Conduct?*

Finally, Coldiron argues that the trial court erred in admitting evidence of her husband's conduct because it was not relevant to any material fact at issue in the stalking case. Coldiron complains that Cordova "was allowed to introduce evidence, over relevance objections, of purported acts of intimidation by Mr. Coldiron."

At trial, Cordova was asked on direct examination if Mr. Coldiron had come into her work area after the incidents with Coldiron had occurred. Coldiron objected: "Objection. Objection, Your Honor. What . . . [Mr.] Coldiron did or didn't do is not the subject of the allegations that [Cordova] made against Michelle [Coldiron], so I don't really see the relevance of what he did or didn't do." Cordova's attorney responded: "Well, I think now that we've had Ms. Miller testifying about all this counseling and things that happened since these events, Your Honor, and this . . . recommendation for withdrawal from a complex situation, that anything that involves Edward [Coldiron] or

19

Michelle [Coldiron] in connection with my client is relevant." Cordova's attorney further argued: "As you know and as the Court knows there's a separate proceeding against Mr. Coldiron. We're not trying to seek relief from him, we're trying to seek relief from . . . Mrs. Coldiron, but I think we have to have the whole picture in order to do it." The court admitted the evidence over Coldiron's objection, finding "that it goes to the weight of the evidence rather than to the . . . admissibility."

Generally speaking, all relevant evidence is admissible. See K.S.A. 60-407(f). "'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The statutory definition contemplates two elements—materiality and probativity. Evidence is material when the fact that it supports is in dispute and is necessary to consider under the substantive law of the case. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 45, 320 P.3d 955 (2014). This court reviews the materiality of evidence using a de novo standard. *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). Evidence is probative, on the other hand, "'if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.' [Citation omitted.]" *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016).

On appeal, Coldiron simply reiterates her arguments from trial. First, she argues that "[t]he evidence regarding Mr. Coldiron's purported 'hard, intimidating' looks at [Cordova] was not material to any fact at issue in this case." She argues that because "[t]here were no allegations against Mr. Coldiron in the stalking petition . . ., any purported intimidating acts of Mr. Coldiron had no bearing on any issue raised in the petition." Next, Coldiron argues that the evidence relating to Mr. Coldiron's supposed intimidation of Cordova "had no probative value with regard to the allegations against [her]." She argues that the evidence "had no tendency to prove or disprove [Cordova's] allegations" because "the purported incidents with Mr. Coldiron occurred days after the three incidents alleged in the stalking petition."

20

But Cordova argues that "[e]ven if admission of [Mr. Coldiron's] conduct was error, it was harmless to the defendant's rights in this case." Cordova specifically argues that even if the trial court erred in admitting the evidence, "no weight was given to that evidence in the court's decision."

K.S.A. 2016 Supp. 60-261 states that unless justice requires otherwise, the erroneous admission or exclusion of evidence will not be grounds for granting a new trial or vacating an order. Instead, "the court must disregard all errors and defects that do not affect any party's substantial rights." Thus, K.S.A. 2016 Supp. 60-261 requires that the complaining party show that its substantial rights have been affected by the alleged error.

Coldiron fails to argue that her substantial rights were affected by the alleged erroneous admission of her husband's conduct. In fact, Coldiron fails to identify the remedy she seeks. Instead, she simply makes the conclusory statement that the trial court abused its discretion in admitting evidence relating to Mr. Coldiron's conduct. An issue that is not briefed by the appellant is deemed waived or abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Because Coldiron fails to argue that her substantial rights were affected by the admission of evidence relating to Mr. Coldiron's conduct, she has abandoned such an argument.

Even if Coldiron had not abandoned her argument, Cordova shows that the alleged error was harmless. At trial, Cordova's attorney stated that he was not offering the evidence relating to Mr. Coldiron's conduct for the purpose of proving any allegations against him. Instead, Cordova's attorney was clear that he was offering the evidence of Mr. Coldiron's conduct because he thought it added credibility to Cordova's version of events. Moreover, because the trial court admitted the evidence over Coldiron's objection, we assume that the trial court used the evidence for the very purpose that Cordova offered it for—to assess the credibility of Cordova's version of events. When a judge is presiding over a bench trial as the fact-finder, he or she is certainly capable of

21

considering evidence for limited purposes. See *Harris v. Rivera*, 454 U.S. 339, 346, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. . . . [S]urely we must presume that they follow their own instructions when they are acting as factfinders.").

Here, at no time did the trial court mention Mr. Coldiron's conduct in issuing its order against Coldiron. We assume that the trial court used the evidence only to aid in making its credibility determination—a very important determination based on the conflicting versions of events presented by the parties. As a result, Coldiron's argument fails.

Affirmed.