NOT DESIGNATED FOR PUBLICATION

No. 118,780

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SINDI J. BAKER and on Behalf of T.B.B., T.D.B., and T.S.B.,
*Appellees*,

v.

JOHN A. REGAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Linn District Court; VALORIE R. LEBLANC, judge. Opinion filed November 16, 2018. Reversed.

*Lewanna Bell-Lloyd*, of Olathe, for appellant.

*Ronald P. Wood*, of Clyde & Wood, L.L.C., of Overland Park, for appellees.

Before ATCHESON, P.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: The law requires anyone seeking a protection from stalking order to present evidence to the court of at least two events so serious that a petitioner fears for his or her safety. The conduct must also reasonably alarm the petitioner, and the petitioner must show the conduct displayed in those events serves no legitimate purpose and is not constitutionally protected. Because Sindi J. Baker failed to present sufficient evidence of two such events, as legally required, we hold the court erred when it granted this order. As a result, we reverse the district court's grant of a protection from stalking order against John Regan.

1

*Baker files a petition against Regan.*

In October 2017, Baker filed a protection from stalking petition against Regan. They are the parents of a daughter. Baker alleged three incidents of harassment justified a protection order:

- Regan followed Baker to their daughter's doctor's appointment;
- Regan followed Baker and their daughter to a church service; and
- Regan stayed on Baker's property without her consent after he had dropped off their daughter.

Baker also claimed there were other incidents where Regan demanded to know her location and he had broken into and entered her home.

We summarize what the record reveals.

At the court hearing, Baker detailed the three incidents. The doctor's appointment was a follow-up examination for their daughter's broken arm. Baker noticed Regan following her after she picked up their daughter from school to go to the appointment. Baker had not told Regan about the appointment. While driving to the appointment, Baker intentionally made several turns to prove Regan was following her. After arriving at the doctor's office, Baker and Regan waited in the lobby. Baker had an appointment for herself before her daughter's appointment. When Baker was called back to see the doctor, Regan tried to follow her. Baker admitted that there was no possibility that Regan knew that she also had an appointment with the doctor. During this incident, Regan allegedly demanded their daughter's medical records. Baker had a friend with her during this incident who corroborated her testimony.

Regan gave a different view of the doctor's appointment. On the Sunday before the appointment, his daughter asked Regan to go to her doctor's appointment. Regan agreed

2

to go. Following their parenting plan, Regan returned his daughter on Sunday evening. Then, on Monday, he went to his daughter's school to eat lunch with her. After lunch, Regan waited in the lobby with his daughter for Baker to pick her up.

Baker entered the school and Regan discussed following Baker to the appointment because he did not know where the doctor's office was. According to Regan, his daughter was called for her appointment first. After he tried to follow her, he was told that the appointment was not for his daughter. He then filled out a form to request his daughter's medical records and was later called back to join his daughter. After the appointment, he left and was unaware of any problem involving this incident until the petition was filed.

The second incident involved Regan allegedly following Baker to church. She was not sure exactly when this occurred but thought it was during the summer of 2017. Regan was late dropping off their daughter, so Baker drove to Regan's house to pick her up to go to church. Regan followed them to church. Regan parked in the parking lot, and Baker did not see him in the church. She had no idea why he followed her to church.

Once again, Regan gave a different spin on this incident. According to him, he followed them to church because his daughter was performing in a church play and she had asked him to come see the performance. Regan attended the play and introduced into evidence a photograph that he had taken of his daughter in the play.

For her third incident, Baker claimed that Regan refused to leave her property after being asked to do so. In October 2017, Regan was late in returning their daughter. Finally, Regan arrived with the girl and one of her friends. According to Baker, her daughter did not expect her to be home and her daughter tried to leave the house. At this point, Baker took her daughter inside to talk with her. While all this was going on, Regan did not leave. Instead, he sent his daughter's friend up to the house several times to eavesdrop.

3

Avoiding a personal confrontation, Baker sent Regan two text messages asking him to leave her property. Eventually, he did. Baker's fiancé stated that he had seen on their home surveillance video the daughter's friend approach the property six times, but no video recording was presented to the district court.

This time, Regan explained why he did not immediately leave. When Regan arrived at the house, he saw no cars in the driveway. His daughter thought that Baker was not home, because she had discussed going to Texas that weekend. Regan made his daughter check whether anyone was home. When she went to the front door, to Regan's surprise, the door was unlocked. After the door opened, the daughter's friend heard someone call for the daughter from inside the house. The daughter went in. The friend returned to Regan's car, but subsequently went back to the door to say goodbye to the daughter.

The daughter's friend heard the daughter say, "'Let me go, let me go, let me go,'" and heard Baker state, "'If you go out that door, I'll beat your ass.'" Regan was worried about the daughter's safety and asked Baker through a text message to send their daughter outside. Baker requested that he leave the property. Regan reiterated his request and threatened to call the police. Baker responded, "'Please do,'" and asked Regan to leave again.

Regan moved his car into the street and subsequently drove away. Later that night, he requested that the police do a welfare check on his daughter. The police found the daughter's welfare was not in jeopardy. The day after, Baker filed this petition.

Baker also told the court about some other incidents where Regan had entered her home without her permission. The first occurred "sometime when it was cold." Baker had gone to dinner with her fiancé and when they returned, Regan was inside with their daughter eating popcorn. Baker believed that the girl had invited Regan into the home.

4

Regan admitted that he entered the home but he justified his actions because of the cold weather.

The second time, Regan let his daughter enter the house through an unlocked cellar door to retrieve some items. According to Baker's fiancé, Regan entered the house with his daughter. Regan agreed that he allowed his daughter to enter the house to gather her belongings and school supplies. He denied personally entering the house. According to Regan, this was the only time that he let his daughter enter Baker's house and it occurred about two years before the petition was filed.

Baker shared other concerns with the court. She alleged that Regan had threatened her and their daughter during a heated exchange. Because of this, coupled with the fact that Regan had moved from Florida to Kansas, she feared for her safety. Regan denied making any threats.

The court granted the protection from stalking order, reasoning that some of the alleged incidents had a legitimate purpose while others were done with the intent to harass Baker. But the court's ruling is not explicit. It appears the court found that the incident involving the doctor's appointment had a legitimate purpose, but it is not clear whether it found that the two other alleged incidents had a legitimate purpose.

The court did seem to rely on the two instances of Regan entering Baker's home as the basis for the finding of harassment. And then, relying on Baker's demeanor during the testimony, the district court found that Baker was fearful and anxious. The court granted the protection from stalking order. Even though the protection order was granted, the district court permitted Regan to continue dropping off their daughter at Baker's house.

5

*Regan's claim over an objection to evidence is harmless error, if it is error.*

The first issue Regan raises on appeal is that the district court erroneously sustained an objection on Baker's intent to move to Texas. During Baker's cross-examination, Regan tried to elicit testimony that she planned to move to Texas. This would support Regan's argument that the filing of Baker's petition was motivated by that move. Baker objected for a lack of relevance and the district court sustained the objection. We will not dwell on this issue because it is, at most, harmless error.

When we review the admissibility of evidence, we must always consider whether the error was harmless. Since this claimed error implicates no constitutional right, we apply the statutory harmlessness test under K.S.A. 2017 Supp. 60-261. Under this test, we review whether the exclusion of the evidence prejudiced Regan's substantial rights. In conducting this analysis we can review the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the case. *State v. Burnett*, 300 Kan. 419, 434-35, 329 P.3d 1169 (2014).

Here, evidence about Baker's intent to move was actually produced through a different witness. Baker's fiancé testified that the couple had discussed moving in the future, but were unsure where they would move. From this evidence Regan could have argued the same inference he tried to argue through the testimony he sought to elicit from Baker. Any error in failing to admit Baker's testimony about moving was made harmless by the introduction of testimony about the couple's intent to move in the future through Baker's fiancé. Thus, this claim is certainly not reversible error.

6

*There was insufficient evidence to support the court's legal conclusion.*

Because Regan is challenging the sufficiency of the evidence, we must decide whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are enough to support the trial court's conclusions of law. *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 736, 159 P.3d 1035 (2007). In assessing sufficiency of the evidence, we do not reweigh the evidence or pass on the credibility of the witnesses. Instead, we view the evidence in the light most favorable to the prevailing party. Our review of the district court's legal conclusions from that evidence is a question of law over which we have unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

The question raised by Regan is not whether the evidence supports the court's factual conclusions but whether those facts support the legal conclusion necessary to issue a protection from stalking order.

For guidance, we turn to *C.M. v. McKee*, 54 Kan. App. 2d 318, 398 P.3d 228 (2017), a recent opinion that sets out the elements that must be proved before a protection from stalking order may be granted.

> "What's considered stalking under the Protection from Stalking Act, K.S.A. 60-31a01 *et seq.*, is set out in three interrelated definitions—covering the terms 'stalking,' 'harassment,' and 'course of conduct.' 'Stalking' is the 'intentional harassment of another person that places the other person in reasonable fear for that person's safety.' 'Harassment' is 'a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose.' And a 'course of conduct' is 'conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress.' The

statute also contains a provision excluding 'constitutionally protected activity' from the definition of course of conduct. . . . [Citations omitted.]" 54 Kan. App. 2d at 321-22.

From these definitions, we hold that a valid stalking claim requires:

- At least two separate acts;
- directed at a specific person;
- intentionally done;
- showing a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress;
- placing that person in reasonable fear for his or her safety;
- through conduct that seriously alarmed, annoyed, tormented, or terrorized the person; and
- that served no legitimate purpose and was not constitutionally protected.

Additionally, according to K.S.A. 2017 Supp. 60-31a05(a), the movant must prove these elements by a preponderance of the evidence.

The court was not explicit in its reasoning. Its conclusion on which events constituted the requisite course of conduct showing harassment is vague:

"I do show, based on the incidents that were provided to the Court, specifically, 1, 2, 3, and additional information in regards to threats and incidents within the home, some of those instances specifically are—talked about the following to the doctor, some of those for legitimate purposes. Others may not have had legitimate purposes and were done with the intent of causing harassing behavior towards the Petitioner."

The district court also commented on the Petitioner's demeanor:

"[Baker's] voice appeared fearful as well as anxious and in her testimony here today in regards to the threats, watching her back and instances with Mr. Regan being in the home

8

with the minor child after being told not to be in the home. That was at least twice that I have written down."

With the court's observations in mind, we do not discount Baker's feelings and emotions. Much can be learned from a court's assessment of the demeanor of a person seeking a protection from stalking order. But at an appellate level, we must look at the facts presented and determine if they legally support the grant of this petition.

We focus on the meaning of "legitimate purpose" within the definition of harassment. Our Supreme Court has stated:  "When we focus on the view of reasonable persons as to when lawful authority exists to follow others, the presence or absence of a legitimate purpose for an act or action can be readily determined." *State v. Rucker*, 267 Kan. 816, 837, 987 P.2d 1080 (1999). That is a case that analyzes the criminal stalking statute. The district court held that Regan following Baker to their daughter's appointment was done for a legitimate purpose and should not be considered a reason to grant the protection from stalking order.

But the district court did not specifically say whether the incident where Regan followed Baker to church was done for a legitimate purpose. Regan presented uncontested evidence that he was at the church to watch his daughter in a play. He introduced a photo into evidence to verify this. For her part, Baker said nothing about the play and never noticed Regan inside the church. This evidence supports a conclusion that Regan followed Baker for a legitimate purpose and this incident should not be used to find a course of harassing conduct.

We move on to the incident where Regan stayed on Baker's property following the exchange of custody. It appears to have a legitimate purpose. The district court, likewise, did not specifically address this incident. Based on the testimony about what was being said inside the house, it appears to be reasonable for Regan to be concerned for his

9

daughter. While it is true that Baker's view of the events is slightly different, but the specific statements about "beating the girl's ass" were uncontroverted. Regan's concern for his daughter is supported by his request to have the police conduct a welfare check on her that night. This evidence fails to support a conclusion that Regan staying on the property served no legitimate purpose.

Going further, the court gave weight to the allegation that Regan had been in the home two times with their daughter after he had been told not to enter the home by Baker. But the court's conclusion is unsupported by the evidence.

First, it is unclear whether Regan entered the home when he let his daughter enter through the cellar to get her belongings. While Regan denied entering the home, Baker at least implied Regan had entered the home with the girl. Baker's fiancé stated Regan had told him that he had entered the home on this occasion. We find this sufficient to support a conclusion that Regan had entered the home on this occasion.

But the conclusion that Baker had told Regan not to enter the home before this happened is unsupported. As for this, Baker testified that "I asked him twice this summer. I don't know the exact dates, but I've asked in person. I've asked on the phone twice that I know for sure." The only testimony came from Regan who estimated the event occurred two years before the protection order being filed. This means that this event occurred prior to Baker telling Regan not to enter the home without her permission. For the second event, Regan entered the home. There is no testimony exactly when this occurred, but it happened sometime when it was cold. Because Regan was told not to enter the house during "this summer," the district court's conclusion that this occurred after Regan had been told not to enter the property is erroneous.

The timing of the warning not to enter the property is important because it undermines the conclusion that Regan acted intentionally and thus displayed a continuity

10

of purpose that would cause a reasonable person substantial emotional distress. Certainly, having someone in your home without your permission could cause a reasonable person substantial emotional distress. Furthermore, had Regan entered the house after being told not to enter, there would then be sufficient evidence of a continuity of purpose to harass Baker that would support issuing a protection order. But given our conclusion from the record that Regan was warned not to enter until sometime after the second event had occurred, Regan's actions show no continuity of purpose to cause substantial emotional distress to Baker.

In contrast, Regan's actions show the purpose of entering the house on both occasions was for taking care of their daughter. For the first instance, Regan entered the property for his daughter to obtain some of her belongings. For the second incident, Regan entered the home after being invited in by his daughter. Regan explained that he entered the home because it was cold outside and he could not leave his daughter alone. Regan probably should have refrained from entering Baker's house uninvited. But these actions in context show no continuity of purpose that would cause a reasonable person substantial emotional distress. Thus, these actions do not satisfy Baker's burden to show harassment.

The district court reached an erroneous conclusion based on the evidence. For the three incidents delineated within the petition, Regan had a legitimate purpose for his conduct. The two times that Regan had entered into Baker's home without her permission show no course of conduct necessary to conclude the actions were harassment.

We reverse the protection from stalking order due to a lack of evidence. The record fails to show, as required by the statute, two separate acts that have no legitimate purpose and two acts that reveal a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress.

11

Reversed.