NOT DESIGNATED FOR PUBLICATION

No. 122,212

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

S. F., and on
behalf of A.F., B.F., R.F., O.F., and A.F.,
*Appellees*,

v.

D. S.,
*Appellant*.


MEMORANDUM OPINION

Appeal from Miami District Court; VALORIE R. LEBLANC, magistrate judge. Opinion filed April 23, 2021. Affirmed.

*Michael Page Jr.*, of Olathe, for appellant.

No appearance by appellee.

Before GREEN, P.J., MALONE and WARNER, JJ.

PER CURIAM: D.S. (Grandmother) appeals the trial court's judgment granting S.F.'s protection from stalking (PFS) petition, which she filed on behalf of herself and her minor children. On appeal, Grandmother argues that insufficient evidence supported the trial court's decision to grant the PFS petition of S.F. (Mother). She also argues that the trial court erred by awarding Mother $3,000 in attorney fees. Mother has not filed a brief in response to Grandmother's appeal. Regardless, because Grandmother's arguments are unpersuasive and otherwise unsupported by the record on appeal, we affirm both the trial court's judgment to grant Mother's PFS petition and to award Mother $3,000 in attorney fees.

1

*Background Information*

As of June 25, 2018, Mother had five minor children: A.F. was 16 years old, B.F was 9 years old, R.F. was 8 years old, A.F. was 1 year old, and O.F. was 1 month old. [The oldest child and the second youngest child have the same initials—A.F. We could not find a middle initial for either child to distinguish them. As a result, we have decided to distinguish them by adding a second letter to the first initial of each sibling. As a result, the oldest sibling, A.F., will be referred to as AA.F., and the youngest sibling, A.F., will be referred to as AO.F.]

Before June 25, 2018, Mother had sometimes allowed the children to stay at their Grandmother's house. Also, before that date, Mother had frequently relied on Grandmother for housing and money.

For example, between 2007 and 2016, Mother, AA.F., B.F., and R.F. had lived in housing owned by Grandmother on multiple occasions. Sometime after 2016, Grandmother had bought and then gifted Mother a double-wide trailer. In late 2017, Grandmother had paid Mother's back taxes, approximately $800. And at some point, Grandmother had paid Mother $820 so AA.F. could "enroll in classes" and $350 so AA.F. could buy a class ring.

In addition to the preceding expenses, before June 25, 2018, Grandmother had routinely paid the costs associated with AA.F.'s rodeo competitions. For instance, Grandmother had "purchased all the horses" AA.F. used during rodeo competitions and paid for the entirety of those horses' feed and care. Grandmother had also bought a horse trailer, which was parked in Mother's driveway, so AA.F. could transport the horses when needed. This horse trailer was titled in Grandmother's name but payable on death to AA.F. Although a broken back permanently sidelined AA.F. from rodeo competition in

2015, it seems that after AA.F. broke her back, Grandmother allowed AA.F. to keep at least some of the horses on Mother's property.

*Uncontroverted Events of June 22-27, 2018*

On June 22, 2018, AA.F. spent the night at Grandmother's house. The next day, June 23, 2018, Grandmother drove AA.F. home to Mother's house. Once at Mother's house, Grandmother asked if B.F. and R.F. could spend the night at her house that evening. Mother agreed; thus, B.F. and R.F. left with Grandmother, spending that night at her house. Grandmother returned B.F. and R.F. to Mother's house the next day, June 24, 2018, around 6 p.m.

Although nothing immediately happened upon Grandmother returning B.F. and R.F. to Mother's house, during the evening of June 25, 2018, B.F. hit R.F. hard enough that he bloodied R.F.'s nose. When Mother told B.F. that she was going to spank him as punishment, B.F. ran away to a neighbor's house. There, B.F. asked the neighbor to call 911 because his Mother was going to hurt him. B.F. then told the neighbor that Grandmother had told him to seek help from a neighbor if he believed that his Mother may hurt him.

The neighbor, however, did not call 911. Instead, after telling B.F. that his Mother did not abuse him, the neighbor contacted Mother.

Yet, before the neighbor contacted Mother, AA.F. called Grandmother and told her that B.F. had run away. Upon receiving AA.F.'s phone call, Grandmother got into her car and started driving towards Mother's house. As Grandmother drove towards Mother's house, Mother, who had just retrieved B.F. from the neighbor's house, called Grandmother. During this phone call, Mother confronted Grandmother about why she

3

had told B.F. to seek help from a neighbor if he believed that she was going to hurt him. Grandmother's response to this question is disputed.

Notwithstanding Grandmother's disputed response, after the phone call between Mother and Grandmother ended, Mother contacted the police. Mother told the police that Grandmother was trying to take her children.

On receiving Mother's phone call, the police drove to Mother's house to investigate Mother's allegation. Once the police officer arrived at Mother's house, AA.F., B.F., and R.F. made allegations of abuse against their Mother.

As the police officer investigated the children's abuse allegations against Mother, he called Grandmother, who was driving towards Mother's house. During his phone call with Grandmother, the officer told Grandmother not to come to Mother's house. He instead explained that if Grandmother wanted to speak with him about her grandchildren's welfare, she should wait in a parking lot nearby Mother's house until he had completed his investigation.

Grandmother complied with the officer's request, waiting in the parking lot nearby Mother's house until the officer spoke with her later that evening. During their conversation, the officer told Grandmother that he did not think the children were in immediate danger. But he also told Grandmother that he would forward his police report to the Department of Children and Families (DCF) for investigation.

After explaining this to Grandmother, Grandmother asked the officer if she could remove her horse trailer and a car that AA.F. had borrowed from Mother's driveway. According to a later affidavit, the officer told Grandmother that she was not currently allowed on Mother's property. The officer then explained the process of obtaining a civil standby to Grandmother so she could remove her horse trailer and car without dispute.

4

Yet, the very next morning—the morning of June 26, 2018—Grandmother drove to Mother's house to retrieve her horse trailer and her car from Mother's driveway. That morning, Grandmother neither contacted the police nor Mother before she attempted to remove her property from Mother's driveway. And although Grandmother later made conflicting statements about whether she knew her grandchildren were home, Grandmother conceded that she drove to Mother's house that morning because she knew that Mother would not be home because she was undergoing outpatient surgery.

Once Grandmother arrived at Mother's house, Grandmother tried to haul her horse trailer out of Mother's driveway with a rented truck. But as Grandmother tried to haul the horse trailer from Mother's driveway, the rented truck started having engine trouble. Grandmother then called a tow truck to tow her horse trailer from Mother's driveway.

When she learned that the tow truck driver was not immediately available, Grandmother travelled to the local courthouse to wait for the tow driver. While there, she spoke to an advocate about potential legal action on behalf of her grandchildren. After speaking to this advocate, Grandmother began completing a protection from abuse (PFA) petition on behalf of AA.F., B.F., and R.F.

Shortly before 4 p.m., Grandmother received a call from the tow truck driver. The tow truck driver told Grandmother that he had removed her horse trailer from Mother's driveway and was waiting to be paid about a block away from Mother's house. As a result, Grandmother stopped completing the PFA petition, went to the tow truck driver's location, and paid the tow truck driver. Immediately after this, Grandmother returned to Mother's driveway to retrieve her car that AA.F. had borrowed.

When she arrived in Mother's driveway, however, a police officer prevented Grandmother from retrieving her car. Then, as Grandmother waited at the end of

Mother's driveway, "another officer came and served" Grandmother with a temporary PFS order; the order prohibited Grandmother from having any contact with Mother, AA.F, B.F., R.F., AO.F, or O.F.

Unbeknownst to Grandmother, around 2 p.m., R.F. had called Mother to report that Grandmother had returned to Mother's house. On receiving R.F.'s phone call, Mother contacted the police. Then, after completing her outpatient surgery, Mother travelled to the local courthouse to complete a PFS petition on behalf of herself and her children. Mother filed her PFS petition at 4:03 p.m. on June 26, 2018.

In her PFS petition, Mother listed two encounters with Grandmother that she believed constituted stalking which entitled her to a PFS order against Grandmother under the Protection from Stalking Act, K.S.A. 2017 Supp. 60-31a01 et seq. First, Mother alleged that Grandmother's conduct on June 25, 2018, was stalking because "[Grandmother] threatened to kidnap [her] children." She further alleged that when she called the police the evening of June 25, 2018, she "had [the] police do a well child check [and] file a report [and] tell [Grandmother that] she is not allowed on [her] property." Second, Mother alleged that Grandmother's conduct that day—June 26, 2018—was stalking because "[Grandmother] came back [to her property] while [she] was [in] surgery[,] took [her] daughter's horse trailer[, and] was on the property 3 more times . . ."

In her PFS petition, Mother also made the following allegations against Grandmother:  (1) that Grandmother was "mentally unstable"; (2) that Grandmother was "very manipulative"; (3) that Grandmother "tried to convince [the] children to lie to the police so they would be taken"; (4) that Grandmother promised AA.F that she could "have sex with her boyfriend and . . . go back to rodeo against [doctor's] orders . . ." if she lied to the police; (5) that Grandmother promised B.F. and R.F. toys if they lied to the police; and (6) that Grandmother "tried [to] file false accusations at [the] courthouse to try to [remove her] children from the home."

6

The next day, June 27, 2018, Grandmother completed and then filed her PFA petition on AA.F.'s, B.F.'s, and R.F.'s behalf.

*Legal Proceedings*

Because AA.F., B.F., and R.F. did not live with Grandmother when she filed the PFA petition on their behalf, the trial court dismissed Grandmother's PFA petition for lack of standing. See K.S.A. 2017 Supp. 60-31a04(b). Although the record contains very little information about Grandmother's private paternity action, it seems that the trial court also dismissed this case. Also, it is undisputed that Grandmother voluntarily dismissed her private child in need of care (CINC) action on AA.F.'s, B.F.'s, and R.F.'s behalf after the guardian ad litem in that case found that the children's abuse claims were unsubstantiated.

As for Mother's PFS petition, almost a year after Mother filed her PFS petition, the trial court held an evidentiary hearing on whether Grandmother's conduct on and about June 25, 2018, and June 26, 2018, constituted stalking entitling Mother, AA.F., B.F., R.F., AO.F., and O.F. to a year-long PFS order against Grandmother. Although none of the children testified, Mother and Grandmother agreed to allow the children's hearsay statements into evidence through their own testimony. Additionally, at the outset of the hearing, Mother argued that Grandmother should pay her attorney fees, totaling $5,000.

During her testimony, Mother repeated the allegation in her PFS petition about Grandmother trying to convince AA.F., B.F., and R.F. to fabricate abuse allegations against her in exchange for gifts. Mother repeated the allegation that Grandmother specifically sought to manipulate AA.F. by allowing AA.F. to have sex with her boyfriend at Grandmother's house and by promising AA.F. that she could return to rodeo

7

competition. Mother further alleged that Grandmother had physically, emotionally, and sexually abused her as a child.

Mother then asserted that since enrolling AA.F., B.F., and R.F. in counseling, she had learned that Grandmother had started abusing the children around June 2017. According to Mother, during counseling, AA.F., B.F., and R.F. alleged that during the year leading up to Grandmother's disputed conduct in late June 2018, Grandmother had done the following: (1) Grandmother had sought to brainwash them by making them frequently repeat false allegations of abuse against Mother; (2) Grandmother had "threatened [them] that if they were to tell [her about Grandmother's abuse of them,] she would make sure that they were no longer alive"; (3) Grandmother had "dropped [B.F. and R.F.] off . . . on 169 Highway in the middle of the night . . . to make sure that they understood that she could kill them if she wanted to"; and (4) Grandmother had "tried to convince [R.F.] to kill [her] and the two infants." According to Mother, during counseling, AA.F., B.F., and R.F. also explained that Grandmother had sought custody of them because she wanted the child support payments Mother received from AA.F.'s, B.F.'s, and R.F.'s respective fathers, which totaled about $1,700 a month. Mother then added that since entering counseling, AA.F., B.F., and R.F. had "improved tremendously" as they "continue[d] to heal from their [posttraumatic stress disorder (PTSD)]" that Grandmother had inflicted.

Next, when asked about when she first discovered Grandmother's plan to obtain custody of AA.F., B.F., and R.F., Mother asserted that she first discovered Grandmother's plan the evening of June 25, 2018, after B.F. had run away to the neighbor's house. She alleged that while B.F. was still missing, R.F. told her:

> "'[G]randma told us that we needed to lie to the police and tell them that you've been abusing us, and that spanking is not legal in Kansas, and that she's going to get us and take us away from you and we will never see you again, and I don't want to go to [G]randma, I'm scared of Grandma.'"

8

She further alleged that during her phone call to Grandmother that evening, Grandmother told her: "'[Y]es, you are not allowed to spank them, it is against Kansas law. You are not allowed to touch those kids. I'm coming to take those kids[,] and there is nothing you can do about it.'"

After testifying about what she learned on June 25, 2018, Mother testified about receiving the phone call from R.F. on June 26, 2018, shortly after finishing her outpatient surgery. She asserted that during this phone call, R.F. said, "[G]randma is going to kidnap us, she's here, she's on the property.'" She alleged that she could tell that all of her children "were in distress" because they believed Grandmother would "make good on her threat" "to kidnap them." She indicated that when she called the police, the police told her to tell her children to "lock the doors, put the bolt on, and hide in a room." She then alleged that because she believed Grandmother may try to take her children, Grandmother's conduct on June 26, 2018, also terrified her. Furthermore, according to Mother's testimony about the affidavit of the police officer who responded to her June 26, 2018 call, this officer reported that the "children denied being abused by mother."

In addition to the preceding testimony, Mother also complained about Grandmother's conduct since obtaining the temporary PFS order against her. She asserted that once after a court hearing, Grandmother tried to speak to the children. She asserted that Grandmother used her best friend's grandchildren to contact AA.F. and R.F. at school. She alleged that Grandmother had picked up school photos of AA.F. from the school although the temporary PFS order barred her from doing so. And she alleged that in July 2018, Grandmother had her other daughter, R.S., force AA.F. to write a diary entry with false abuse allegations against her.

On cross-examination, opposing counsel questioned Mother about the police report made by the officer who responded to her June 25, 2018 call. This report was not admitted into evidence. Still, during this cross-examination, Mother conceded the

following: (1) that the report contained allegations by AA.F., B.F., and R.F. that she abused them; (2) that the report contained a specific allegation by AA.F. that she forced AA.F. to "stand outside in the rain for an extended period . . ." as punishment; (3) that the report contained a specific allegation by B.F. and R.F. that she spanked them hard enough to leave bruises; (4) that the report contained her admission to spanking AA.F., B.F., and R.F. with a belt; and (5) that the report contained no allegations about Grandmother manipulating the children to make false abuse allegations.

During her testimony, Grandmother contradicted most of Mother's testimony. She denied trying to manipulate AA.F., B.F., or R.F. to make allegations of abuse against Mother. She denied trying to obtain custody of AA.F., B.F., and R.F. because she wanted AA.F.'s B.F.'s, and R.F.'s $1,700 in monthly child support payments. She asserted that she filed the PFA, private paternity action, and private CINC action on behalf of AA.F., B.F., and R.F. but not AO.F. and O.F. because nothing indicated that Mother was abusing AO.F. and O.F. then. She then testified about previously helping Mother out financially, noting that she makes about $150,000 a year.

Next, Grandmother testified that before June 25, 2018, Mother had been struggling financially and emotionally. She alleged that Mother had been unemployed since November 2017. Also, she alleged that when she asked Mother about acquiring medication for her ongoing stress and anxiety, Mother told her that she could not currently take any medication because she was pregnant with O.F.

Grandmother then testified that around April or May 2018, AA.F. and B.F. started telling her that Mother was abusing them. According to Grandmother, AA.F. and B.F. told her that Mother frequently beat them, kicked them, bashed their heads into walls, and spanked them with a belt. They told her about a recent incident where Mother had violently attacked AA.F. before forcing AA.F. to spend the night in "a dog house that they had used for a goat" while it was raining. And she explained that it was around this

10

same time that B.F. made his first attempt to run away from Mother's home. Grandmother testified that when she asked B.F. why he had run away following this first attempt, "[B.F.] told [her] that he wanted to run away because he didn't want to be abused anymore by his mother."

Although she did not state on what date she saw the bruises, Grandmother continued her testimony by alleging that she saw "marks on [B.F.'s] back and legs and butt." She then testified that during the evening of June 23, 2018—the night that B.F. and R.F. slept at her house—B.F. told her that he either wanted to run away or live in foster care because of Mother's abuse. According to Grandmother, after B.F. told her this, she told B.F. that he should ask a neighbor for help if he believed Mother may hurt him instead of running away because running away was dangerous. Lastly, Grandmother asserted that R.F., who was present during her conversation with B.F., acknowledged Mother's abusive behavior through a couple of statements, including that "no one should have to live like this."

In addition to her own testimony, AA.F.'s father and R.S. testified on Grandmother's behalf. AA.F.'s father testified that in April 2018, Mother filed a baseless lawsuit against him, which was dismissed, requesting $116,000 in back child support. R.S. testified that in July 2018, she did not force AA.F. to fabricate abuse allegations against Mother in a diary entry at the behest of Grandmother. Instead, R.S. testified that when AA.F. was at her house in July 2018, AA.F. showed her a photo of her June 26, 2018 diary entry in which she discussed Mother's abuse. R.S. testified that AA.F. told her that she was confiding in her about Mother's abuse because she hoped R.S. "could help her because she [did not] feel like she's able to tell the truth."

At the end of the evidentiary hearing, the trial court took the matter under advisement. The trial court, however, held another hearing where it granted from the

11

bench Mother's request for a year-long PFS order to protect her, AA.F., B.F., R.F., AO.F., and O.F. against Grandmother.

In reaching its ruling, the trial court first found Mother's testimony, including Mother's testimony about what AA.F., B.F., and R.F. had told her, credible. It thus accepted Mother's allegation that Grandmother sought to obtain custody over AA.F., B.F., and R.F. by manipulating the children into making false abuse allegations against Mother. It then found that Grandmother's conduct on and about June 25, 2018, and June 26, 2018, constituted stalking under K.S.A. 2017 Supp. 60-31a02(b)-(d) because her conduct had no legitimate purpose, was intended only to harass Mother, AA.F., B.F., and R.F, and to cause Mother, AA.F., B.F., and R.F. to reasonably fear for their safety. Lastly, the trial court awarded Mother $3,000 of her requested $5,000 in attorney fees for two reasons:  (1) because Grandmother had abused the court system by filing her other lawsuits on behalf of AA.F., B.F., and R.F.; and (2) because Mother "had to fight for her children and for their protection."

Grandmother timely appealed.

*Does Sufficient Evidence Support the Trial Court's Protection From Stalking Order?*

On appeal, Grandmother argues that insufficient evidence supported the trial court's decision to grant Mother's PFS petition because her disputed conduct on June 25, 2018, and June 26, 2018, did not constitute stalking as defined under K.S.A. 2017 Supp. 60-31a02(b)-(d) for two reasons:  First, she contends that no reasonable person would have reasonably feared for their safety based on her disputed conduct. Second, she contends that she engaged in her disputed conduct for "legitimate purposes" because she was concerned about Mother abusing the children.

12

*Applicable Law*

When considering an appeal from the trial court's decision to grant a PFS petition, we apply a two-step standard of review. Under the first step of our review, we consider the trial court's fact-findings for "substantial competent evidence." *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 736, 159 P.3d 1035 (2007). Meanwhile, under the second step of our review, we consider whether the trial court's fact-findings support its conclusion of law while exercising unlimited review. 37 Kan. App. 2d at 736.

When evaluating the trial court's fact-findings for "substantial competent evidence" under the first step of our review, substantial competent evidence exists if a reasonable person could accept the trial court's fact-findings as sufficient to support the trial court's ultimate legal conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). While engaging in this analysis, we must refrain from reweighing the evidence and reassessing credibility determinations. Indeed, while engaging in this analysis, we must "view the evidence in the light most favorable to the prevailing party." *Wentland*, 37 Kan. App. 2d at 736.

K.S.A. 2017 Supp. 60-31a01, et seq. provides that persons who believe they are being stalked or believe that their minor children are being stalked may seek relief under the Protection from Stalking Act. See K.S.A. 2017 Supp. 60-31a04(b) (stating who has standing to seek relief under the Protection from Stalking Act). And K.S.A. 2017 Supp. 60-31a02, which defines stalking, states:

> "(b) 'Stalking' means an intentional harassment of another person that places the other person in reasonable fear for that person's safety.
> "(c) 'Harassment' means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose. . . .

13

"(d) 'Course of conduct' means conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress. Constitutionally protected activity is not included within the meaning of 'course of conduct.'"

Significantly, whether an alleged stalker's disputed conduct would cause a reasonable person to fear for their safety as stated under K.S.A. 2017 Supp. 60-31a02(b) or to suffer substantial emotional distress as stated under K.S.A. 2017 Supp. 60-31a02(d) depends on the alleged stalking victim's age. When the alleged stalking victim is an adult, we apply the general reasonable person standard. On the other hand, when the alleged stalking victim is a minor, we apply a reasonable child standard. See *C.M. v. McKee*, 54 Kan. App. 2d 318, 322, 398 P.3d 228 (2017). As a result, we can summarize K.S.A. 2017 Supp. 60-31a02(b)-(d) as follows:  To be entitled to a PFS order, the PFS petitioner must establish that the alleged stalker intentionally harassed the alleged stalking victim on least two occasions without a legitimate purpose and in a manner that would cause a reasonable person who is the same age as the stalking victim to reasonably fear for his or her safety and to suffer substantial emotional distress.

*Preliminary Evidentiary Issues*

Having reviewed the applicable law, we must now consider some evidentiary issues that limit our ability to consider Grandmother's underlying arguments. In this case, the trial court made an explicit credibility determination in favor of Mother when granting Mother's PFS petition. Also, all the trial court's fact-findings were consistent with Mother's testimony and contrary to Grandmother's testimony. Thus, although the trial court did not explicitly make a credibility determination against Grandmother when granting Mother's PFS petition, the trial court did make an explicit credibility determination in favor of Mother when it made all of its fact-findings consistent with Mother's testimony. Hence, the trial court implicitly made a credibility determination against Grandmother.

14

Nevertheless, Grandmother contends that her conduct on and about June 25, 2018, and June 26, 2018, served a legitimate purpose. Thus, she is making a quality argument—that her conduct on the previously mentioned dates was justified because the children were being abused by their Mother. In making this quality argument, however, Grandmother is implicitly conceding that she did those things that Mother alleged in her trial testimony. And so the question of whether Grandmother did those things on and about June 25, 2018, and June 26, 2018, have been waived from the dispute. When you say, "It is good thing because I did those things to protect my grandchildren from abuse," you are implicitly conceding that you did those things.

Also, our ability to consider Grandmother's argument is further limited by Grandmother's failure to include any of the evidentiary hearing exhibits in the record on appeal. Those evidentiary hearing exhibits included the DCF report detailing its findings following its investigation and an affidavit from the police officer who responded to Mother's June 26 call.

Although other information in the record indicates that DCF determined the children's abuse allegations against Mother were unsubstantiated, because this case hinges on the veracity of the children's abuse allegations against Mother, Grandmother's failure to include the DCF report severely limits our ability to analyze Grandmother's underlying arguments. Plainly, if DCF had concerns that the children may have been abused by Mother, the report may have supported Grandmother's contention that her disputed conduct served the legitimate purpose of protecting her grandchildren from Mother's abuse. More importantly, however, the trial court explicitly rejected Grandmother's argument that DCF's findings as detailed in its report established that she had a legitimate purpose to engage in the disputed conduct. As a result, by failing to include the DCF report in the record on appeal, Grandmother has precluded us from reviewing the trial court's critical fact-finding.

15

As for the police officer's affidavit, clearly, having the affidavit in the record on appeal would have been helpful because it would have included the officer's unbiased perspective of Mother's and Grandmother's allegations. Inclusion of this affidavit was also critical because according to Mother's testimony, the affidavit stated the following: (1) that AA.F., B.F., and R.F. now "denied being abused by mother"; and (2) that the officer who responded to her call on the 26th had spoken to the officer who responded to her call on the 25th, and this officer had told him that Grandmother had been told she was not allowed on Mother's property.

It is a well-known rule that the party alleging error must designate a record sufficient to establish that error. Without such a record, we presume the disputed action of the trial court was proper. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 917, 416 P.3d 999 (2018). Because Grandmother here has not included the DCF report in the record on appeal, we presume that the trial court correctly found that the DCF report did not establish that Grandmother had a legitimate purpose to engage in the disputed conduct on and about June 25, 2018, and June 26, 2018. For this same reason, we presume Mother truthfully testified about the police officer's affidavit detailing his conversations with the officers who responded to Mother's June 26 call as well as his investigation of Mother's June 26 call.

*Sufficient Evidence as to Mother, AA.F., B.F. and R.F.*

With the preceding evidentiary issues in mind, we may now consider Grandmother's underlying argument that insufficient evidence supported the trial court's decision to grant Mother's PFS petition as applied to Mother, AA.F., B.F., and R.F.

In ruling from the bench, the trial court cited to three incidents to support its order. First, the trial court found that Grandmother's conduct on and about June 25, 2018,

16

constituted the stalking of Mother, B.F., and R.F. It found that Grandmother's conversations with B.F. and R.F. before June 25, 2018, about making false abuse allegations against Mother constituted one incident of stalking. It then found that Grandmother's phone conversation with Mother about "coming to get the kids" on June 25, 2018, constituted a separate incident of stalking for Mother. Also, the trial court found that Grandmother's conduct, that is, Grandmother's respective conversations with Mother, B.F., and R.F. on and about June 25, 2018—caused Mother, B.F., and R.F. to reasonably fear for their safety and suffer substantial emotional distress.

Second, the trial court found that Grandmother's removal of her horse trailer on June 26, 2018, constituted a separate incident of stalking as to Mother, AA.F., B.F., and R.F. The trial court explicitly accepted Mother's testimony that Grandmother knew she was no longer allowed on her property. And it referred to the police officer's affidavit that Mother admitted into evidence, stating that Grandmother had previously been told she was not allowed on Mother's property and that Grandmother needed to request a civil standby to reclaim the horse trailer. It then pointed to R.F.'s phone call to Mother on June 26, 2018, where R.F. told Mother that Grandmother was at Mother's house to kidnap them, as well as the police officer's later directions to the children to stay inside the house, lock the doors, and hide in a room. It found that this evidence sufficiently established that Grandmother's conduct on June 26, 2018, caused Mother, AA.F., B.F., and R.F. to reasonably fear for their safety and suffer substantial emotional distress.

Third, the trial court found that other conduct by Grandmother on and about June 25, 2018, and June 26, 2018, constituted a separate act of stalking as to AA.F. Specifically, the trial court found that the following conduct constituted the intentional harassment of AA.F. with no legitimate purpose: (1) Grandmother's attempt to have AA.F. falsify abuse allegations against Mother in exchange for returning to rodeo competition; (2) Grandmother's attempt to have AA.F. falsify abuse allegations against Mother in exchange for being able to have sex with her boyfriend at Grandmother's

17

house; and (3) Grandmother's later efforts with R.S. to make AA.F. falsify abuse allegations against Mother in a diary entry. The trial court also found that the preceding conduct by Grandmother reasonably caused AA.F. to fear for her safety and suffer substantial emotional distress.

In her brief, Grandmother challenges the trial court's findings that the preceding three incidents constituted stalking under K.S.A. 2017 Supp. 60-31a02(b)-(d). In essence, for all three incidents, Grandmother contends that her disputed conduct could not have reasonably caused any adult or child to fear for their safety and that her disputed conduct served a legitimate purpose.

As to the first incident, Grandmother argues that Mother could not have reasonably feared for her safety based on her conduct on and about June 25, 2018, because "[t]he only serious alarm, annoyance, or fear that [Mother] had was that [she] was going to get her in trouble for physically disciplining the children." She argues that B.F. and R.F. could not have reasonably feared for their safety because there was no evidence that she "physically harmed [the] children." Also, she asserts that she had a legitimate reason for her conduct on and about June 25, 2018, because she feared that her grandchildren were being abused. In making this argument, Grandmother emphasizes (1) that Mother admitted to spanking the children with a belt in the past and (2) that B.F. ran away from home at least twice.

As to the second incident, Grandmother argues that her conduct on June 26, 2018, could not have reasonably placed Mother, AA.F., B.F., or R.F. in fear for their safety (1) because "[t]here was not a no-contact order in place keeping [her] from picking up her trailer" and (2) because she never interacted with AA.F., B.F., or R.F. when she removed her horse trailer from Mother's driveway. She also argues that she had a legitimate purpose for coming to Mother's house on June 26, 2018, because she owned the property she sought to remove from Mother's driveway. According to Grandmother, the fact that

18

she knew Mother would not be home when she sought to retrieve her property shows that she was trying to avoid escalating the situation between her and Mother.

As to the third incident involving the trial court's fact-findings specific to AA.F., Grandmother essentially repeats her argument that insufficient evidence supported the trial court's fact-findings as to the first incident. She contends that "[a]lowing [AA.F.] to spend time with their significant other against [Mother's] wishes [could not] possibly put a child in fear for [her] safety." Also, in challenging the trial court's fact-findings as to the third incident, Grandmother again argues that she had a legitimate purpose for engaging in her disputed conduct concerning AA.F. because she sought to protect AA.F. from Mother's ongoing abuse.

Nevertheless, Grandmother's arguments are flawed for multiple reasons. For starters, spanking, in and of itself, does not necessarily constitute child abuse in Kansas. Instead, spanking only constitutes child abuse if the child suffers a physical injury because of the spanking. See *L.E.H. v. Kansas Dept. of SRS* , 44 Kan. App. 2d 798, 806, 241 P.3d 167 (2010). Although it is very possible that spanking a child with a belt may injure the child and thus constitute abuse, the trial court explicitly rejected Grandmother's argument that DCF's findings as detailed in its report established that she had a legitimate purpose to engage in the disputed conduct. Also, the trial court made a credibility determination against Grandmother.

Thus, for the reasons previously discussed, we must accept the trial court's credibility determination against Grandmother and interpretation of the DCF report findings. See *Wentland*, 37 Kan. App. 2d at 736 (holding that this court does not reassess the trial court's credibility determinations); and *In re T.M.M.H.*, 307 Kan. at 917 (holding that when an appellant provides an inadequate record on appeal, this court presumes the trial court's disputed fact-finding was correct). Thus, in deciding Grandmother's appeal, we must presume the following:  (1) that Mother's testimony that Grandmother sought to

19

obtain custody of AA.F., B.F., and R.F. by manipulating them to falsify abuse allegations against Mother is true, and (2) that DCF's report findings supported Mother's testimony. In turn, Grandmother's argument why she had a legitimate purpose for her disputed conduct as to all three incidents is unpersuasive.

As for Grandmother's arguments that Mother, AA.F., B.F., and R.F could not have reasonably feared for their safety based on her conduct on and about June 25, 2018, and June 26, 2018, Grandmother's argument ignores Mother's evidentiary hearing testimony. To review, Mother testified that following her phone call with Grandmother the evening of June 25, 2018, she feared Grandmother was going to take her children from her. Indeed, she testified that Grandmother told her that she was "coming to take [her] kids and there [was] nothing [she could] do about it." She further alleged that Grandmother had abused her as a child.

As to AA.F.'s, B.F.'s, and R.F.'s fear, Mother testified that because of Grandmother's efforts to have them fabricate abuse allegations against her, AA.F., B.F., and R.F. suffer from PTSD. She testified that in counseling, she learned that around June 2017, Grandmother started "abusing the kids." She learned that Grandmother had "threatened the children that if they were to tell [her about the abuse,] she would make sure that they were no longer alive." She learned that Grandmother had "dropped [B.F. and R.F.] off . . . on 169 Highway in the middle of the night . . . to make sure that they understood that she could kill them if she wanted to." She learned that Grandmother had tried to convince R.F. to kill AO.F. and O.F. And she learned how Grandmother had made AA.F., B.F., and R.F. repeat false allegations of abuse against her to brainwash them. Mother additionally testified about how Grandmother, with the help of R.S., forced AA.F. to fabricate abuse allegations against her in a diary entry.

Once again, because the trial court determined that Mother's testimony was credible, we must accept Mother's testimony as true. See *Wentland*, 37 Kan. App. 2d at

20

736. Mother, as a person who had been previously abused by Grandmother, could have reasonably feared for her own safety the evening of June 25, 2018, upon learning from her children that Grandmother was involved in abuse allegations against her, which she knew were false. And she could have experienced additional fear for her own safety on June 26, 2018, upon learning from R.F. that Grandmother had returned to her property. Although Grandmother stresses that there was not a specific court order in place preventing her from returning to Mother's property that day, Grandmother's argument ignores that Mother testified that she explicitly told Grandmother she was not allowed on her property. Grandmother's argument also ignores Mother's testimony about the affidavit from the police officer who responded to her call on June 26; again, according to Mother's testimony, this affidavit stated that the officer who responded to Mother's call on the 25th had warned Grandmother that she was not allowed on Mother's property.

AA.F., as a teenager who Grandmother had warned would "no longer [be] alive" if she told Mother about Grandmother's ongoing abuse of her and her siblings, could have reasonably feared for her safety on and about June 25, 2018, because she believed that Grandmother may further abuse her if she did not make false abuse allegations against Mother. The same is true for B.F. and R.F.  B.F. and R.F., as children who Grandmother had warned would "no longer [be] alive" if they told Mother about Grandmother's ongoing abuse of themselves and AA.F., could have reasonably feared for their safety on and about June 25, 2018, because they believed that Grandmother may further abuse them if they did not make false abuse allegations against Mother. The children's fear was also reasonable in light of the evidence that Grandmother had previously abandoned B.F. and R.F. on a highway at night and asked R.F. to kill his younger siblings.

As for AA.F.'s, B.F.'s, and R.F.'s fear on June 26, 2018, a reasonable fear that Grandmother may abuse them if they did not make false abuse allegations against Mother would have still existed on June 26, 2018. Also, Mother's testimony about R.F. calling her around 2 p.m. on June 26 and telling her, "Grandma is going to kidnap us.." supports

21

that AA.F., B.F., and R.F. were afraid about what Grandmother may do to them. Indeed, because AA.F., B.F., and R.F. were home alone and because Grandmother returned to Mother's property unannounced, it is not unreasonable to assume that Grandmother's conduct frightened AA.F., B.F., and R.F.

Thus, to summarize, Grandmother argues that insufficient evidence supported the trial court's decision to grant Mother's PFS petition as to Mother, AA.F., B.F., and R.F. because her conduct on and about June 25, 2018, and June 26, 2018, could not have caused a reasonable adult or child to fear for their safety and because she otherwise engaged in the disputed conduct for a legitimate reason. Nevertheless, Grandmother's arguments are unpersuasive. When viewing the facts in the light most favorable to Mother, and when viewing the facts in the context of the evidentiary issues previously discussed, sufficient evidence supported the trial court's finding that Grandmother stalked Mother, AA.F., B.F., and R.F. as meant under K.S.A. 2017 Supp. 60-31a02(b)-(d).

*Arguments Abandoned as to AO.F. and O.F.*

Although sufficient evidence supported the trial court's finding that Grandmother stalked Mother, AA.F., B.F., and R.F. as meant under K.S.A. 2017 Supp. 60-31a02(b)-(d), there was negligible evidence presented at the evidentiary hearing on Mother's PFS petition about AO.F. or O.F.; they were one-year old and one-month old, respectively, when Grandmother engaged in the disputed conduct. Grandmother has not challenged the trial court's ruling as to AO.F. and O.F. in her brief. Indeed, like the trial court when granting Mother's PFS petition, Grandmother never even mentions AO.F. or O.F. in her brief.

It is a well-known rule that we will deem any issue not briefed by an appellant as waived and abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Because Grandmother has failed to challenge the trial court's decision to grant

Mother's PFS petition as to AO.F. and O.F., we conclude that Grandmother has waived and abandoned her ability to do so.

*Did the Trial Court Err by Awarding Mother Attorney Fees?*

Finally, in her brief, Grandmother challenges the trial court's decision to award Mother $3,000 in attorney fees. Grandmother argues that the trial court's attorney fees award was unreasonable because she should not be punished for her acts in the other lawsuits she brought on behalf of AA.F., B.F., and R.F.

K.S.A. 2017 Supp. 60-31a06(f) provides that the trial court "shall assess costs against the defendant and *may* award attorney fees to the victim in any case in which the court issues a protection from stalking . . . order pursuant to this act." (Emphasis added.) Thus, we review a trial court's attorney fees award for an abuse of discretion. A trial court abuses its discretion if it makes its decision based on an error of law, an error of fact, or an otherwise unreasonable ground. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3rd 931 (2018).

Before starting the evidentiary hearing on Mother's PFS petition, the trial court dismissed Grandmother's PFA petition without costs. And in doing so, the trial court stated that it was going to reserve its ruling on Mother's request for sanctions in that case. Later, when the trial court began its ruling from the bench, it explicitly noted that it had reserved its ruling on Mother's request for sanctions. Afterwards, the trial court awarded Mother $3,000 in attorney fees for two reasons: (1) because Grandmother had abused the court system by filing her other lawsuits on behalf of AA.F., B.F., and R.F.; and (2) because Mother "had to fight for her children and for their protection."

So although Grandmother complains that the trial court should not have awarded Mother attorney fees because she had abused the court system by filing her other lawsuits

on behalf of AA.F., B.F., and R.F., when the trial court dismissed her PFS petition, it gave Grandmother notice that it intended to consider Mother's sanction request after the evidentiary hearing on Mother's PFS petition. When the trial court provided this notice, Grandmother did not object to the trial court's decision to reserve its ruling on Mother's sanction request until after the evidentiary hearing. Also, when the trial court eventually awarded Mother the attorney fees, Grandmother did not object to the trial court's consideration of her conduct in other lawsuits. As a result, Grandmother's argument is not properly before us. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011) (holding that issues not raised below cannot be raised for the first time on appeal).

Notwithstanding the preceding problem, Grandmother's argument does not adequately consider the second basis for the trial court's attorney fee award, i.e., that Mother "had to fight for her children and for their protection." When viewed in context, the trial court clearly found that Mother "had to fight for her children and for their protection" partly because Mother had sustained substantial costs in defending her PFS petition. Here, because sufficient evidence supported the trial court's finding that Grandmother stalked Mother, AA.F., B.F., and R.F. as meant under K.S.A. 2017 Supp. 60-31a02(b)-(d), sufficient evidence also supported the trial court's finding that Mother had to fight to protect AA.F., B.F., and R.F. in response to Grandmother's inappropriate conduct. Under such circumstances, it was not unreasonable to award Mother $3,000 of the $5,000 she requested in attorney fees. Thus, we affirm the trial court's attorney fees award.

Affirmed.

24